[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 10, 2009
THOMAS K. KAHN
CLERK

_____

No. 07-15876

_____

D. C. Docket No. 04-01378-CV-ORL-28KRS

CURTIS WINDOM,

Petitioner-Appellant,

versus

SECRETARY, DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(August 10, 2009)

Before EDMONDSON, BIRCH and BARKETT, Circuit Judges.

PER CURIAM:

Petitioner Curtis Windom, sentenced to death for the first-degree murders of Johnnie Lee, Valerie Davis, and Mary Lubin, appeals the orders of the district court denying his petition for a writ of habeas corpus, entered on 2 November 2007, and denying his Rule 59(e) motion to alter or amend the judgment, entered on 14 November 2007. In this appeal, we must decide whether the Florida state courts unreasonably applied clearly established federal law when they found that Windom failed to establish that his penalty-phase counsel rendered ineffective assistance by: (1) neglecting to investigate and present available evidence from mental health experts and lay witnesses related to statutory and non-statutory mitigating factors, and (2) conceding the state's case for aggravation. For the reasons that follow, we AFFIRM the district court's denial of Windom's habeas petition.

## I. BACKGROUND

A.  Trial – Guilt Phase

Windom was indicted in 1992 by an Orange County, Florida grand jury on three counts of first-degree murder and one count of attempted first-degree murder. At trial, Jack Luckett testified that he spoke with Windom on the morning of the shootings and that Windom asked him if Johnnie Lee had won any money at the

dog track.[1]  When Luckett told Windom that Johnnie Lee had won $114, Windom, whom Johnnie Lee owed $2000, told Luckett, "'My nigger, you're gonna read about me'" because he was going to kill Lee.  R2-23, Appendix to State's Habeas Response, Appx. A4 ("A4") at 356.  Later that same day, Windom purchased a .38 caliber revolver and a box of fifty .38 caliber shells from Abner Yonce at a Walmart store in Ocoee, Florida.  According to Yonce, there was nothing unusual about Windom, whom he described as "'calm as could be.'"  Id.

Almost immediately after purchasing the gun, Windom pulled up in his car next to Lee, who was standing on the sidewalk talking to Luckett and two women. Luckett and the two women all testified that Windom's car was close to Lee and that Windom leaned across the passenger seat of his car and shot Lee twice in the back.  After Lee collapsed to the ground, Windom got out of the car and, standing over him, shot him two more times at very close range.  Windom thereafter ran towards the apartment where Valerie Davis, his girlfriend and the mother of one of his children, lived.  Within seconds of arriving at the apartment, and without provocation, Windom shot Davis in the left chest area as she talked on the telephone.  Windom fled the apartment and ran outside, where he encountered Kenneth Williams on the street.  Windom shot Williams in the chest area at very

---

[1] This recitation of the facts adduced at trial is taken almost verbatim from the trial judge's sentencing order.

close range.  Though hospitalized for almost a month, Williams survived.  He testified that when Windom shot him, Windom did not look normal and that his eyes were "'bugged out like he had clicked.'"  Id. at 358.

After shooting Williams, Windom made his way to Brown's Bar, where three men, including Windom's brother, attempted to take the gun from him.  By that time, Davis' mother, Mary Lubin, who moments earlier had learned that her daughter had been shot, had left work in her car and was driving down the street.  When she stopped at a stop sign, Windom approached her car, said something to her, and then shot her twice, killing her.  The jury returned guilty verdicts on all four counts of the indictment.

B.  Trial – Penalty Phase

In his opening statement before the jury, Windom's attorney, Ed Leinster, made the following remarks:

> Since I'm the same individual that was largely unsuccessful in convincing anyone here that Mr. Windom did not do everything the state said he did and in the degree that they said he did. I hope that I can at least keep your attention through this particular phase.
>
> . . . .
>
> Nothing about this has been fun. Trying a first-degree murder case is about as brutal as it gets. I wasn't there, I didn't participate. My job is to try to save a man's life, end of story. You made your decision. It wasn't too tough.

4

Broad daylight, what can you say? I would have to be the firm of Christ and Houdini to have made anything out of this other than what it clearly was.  So the question now for you is, do we pay any homage to what several people refer to as the sanctity of human life at this point? Does he forfeit his life?

. . . .

You are going to hear a few people who are going to testify. I'm frankly not quite sure what they are going to say as far as the state's presentation. And they will be presenting aggravating factors to you.  Those are by law statutory aggravating factors that have to be proven beyond a reasonable doubt.

Then we present testimony that essentially says he is not all bad.  That is a tough pitch for people who have heard what he did.  And it is my job once again to try to convince you. You may already be convinced.  You may have already made up your minds; I hope not. But my job is going to be at least to try to say this man doesn't need to die.

There is no reason for him to die.  And I guess the ultimate conclusion that we are all going to find out when this is all over really through your determination is really what we mean by the sanctity of human life. Because he is a human, too.

R2-23, Appendix to State's Habeas Response, Appx. A1 ("A1") at 26-28.

The state then called Vickie Ward, a police officer with the Winter Garden

Police Department who at the time of the 1992 shootings had been assigned to the

D.A.R.E. program at a local elementary school, to testify as to the impact of the

5

murders on the Winter Garden school children.[2]  Defense counsel presented no

testimony or other mitigating evidence to the jury.  During a bench conference, the

following exchange occurred between Leinster and the trial judge:

Mr. Leinster:      The state having chosen to put on what they put on, we could put on a variety of individuals whose testimony would be essentially that in their personal observations of the defendant, they had never seen anything quite like this or this kind of presentation.  That he seemed to be out of his mind at the time, was part of the trial testimony which the jury can consider for purposes of the penalty phase.

     What that does open up, however – and I can't control how these people deliver their presentation . . . is the possibility for the state to then cross-examine them about such things as you didn't see him do this, so forth, but were you aware of bla, bla, bla, bla [sic] the following.  And this has been from start to finish, a cocaine case with a murder overlay.  The jury hasn't heard that.

The Court:         About the cocaine.

Mr. Leinster:      About the cocaine. And I have had to tread a very thin line from the beginning to end. And I'm doing this for the record, not to amuse you or anything.

The Court:         I know, and I'm letting you not to amuse you.

---

[2] Ward also had been involved in the investigation of the murders.

Mr. Leinster: There are ways of approaching these kinds of cases. And I would probably have tried this case in a different fashion if it were not a first-degree murder case, if it didn't have a death sentence attached to it, I may have been perfectly happy to let the jury hear that there was cocaine involved. And the other people that were involved and that there were notions of his girlfriend sleeping with another person and that she might have been an informant and on and on and on. Except for the fact that, in my opinion, that would have made an already almost inextricable legal situation worse.

So I did the very best I could with what I had which was, I didn't have a pair, you know, that the state had a straight flush, and I didn't even have enough to bluff with. Now, what we have got now is, the state because of I think your rulings has put on one person which is not an aggravating factor.

And if I put on a slew of potential people to say nice things about Curtis Windom, and I'm sure they will, there is the distinct possibility that those folks are going to be asked questions in cross-examination that I may find highly objectionable. But once the question is asked, it is asked. Whether you agree with me or not, ultimately, the jury has heard it.

And in my opinion, what we end up with is Curtis Windom is tried for drugs and not for what happened. So I as his lawyer have made a strategic decision, wise or unwise, not to call these folks and to argue

7

|              |                                                                                                          |
|--------------|----------------------------------------------------------------------------------------------------------|
|              | what we have got here. And if I am wrong, of course, some day I'm going to hear about it.                 |
| The Court:   | Well, have you discussed this with your client and is he in agreement with this?                          |
| Mr. Leinster: | I discussed this with my client before lunch. I don't know if he is in agreement with it or not. Curtis, are you in agreement with it? |
| [Windom]:    | Yes.                                                                                                     |
| The Court:   | You are?                                                                                                 |
| [Windom]:    | Yes.                                                                                                     |
| The Court:   | Do you understand why he is doing it this way?                                                           |
| [Windom]:    | Yes.                                                                                                     |
| The Court:   | Why do you understand it to be?                                                                          |
| [Windom]:    | Because he don't want the drug thing to come in.                                                         |

Id. at 39-41.

Following the bench conference, Leinster delivered his closing argument to

the jury:

> During voir dire . . . I asked a lot of people about their feelings about the death penalty. And I don't think I ever got a response that made a bit of sense. Usually what it is is, well, if someone takes a life, then he forfeits his life. Once that person makes a decision to kill someone else, then he ought to die.

8

And that same nonsense is uttered by people who in the same breath vouch for the sanctity of human life . . . Why do you tell me on the one hand that you believe in the value of human life, and yet you tell me that if somebody kills another, they should forfeit theirs?

. . . .

Killing this man, that is what Mr. Ashton wants to do. That is what the state wants to do; it is. Don't dress it up, they want to kill him.

Okay, he did everything a human could probably do to deserve that in the sense that it outrages us. It makes us angry. And if it had been one of ours, if it had been one of our close loved ones and he had done it, we wouldn't have been worrying about the police. We would have gone and killed him.

. . . .

And when we say to those children. . . that the state said were affected by this, when we take the message back to them that we have today killed Curtis Windom, we have electrocuted Curtis Windom, what is that message? The message is that we condone killing.

. . . .

There are actually people who are willing to say intellectually, why should taxpayers have to pay for someone to sit in prison for the rest of their [sic] life? As though economics has something to do with a human life. Now, I'm not here telling you that this is a good fellow.

He is a human being. He is not a good fellow. You have said that, okay. But now what you are being asked to do is to kill him. And despite the fact that your decision is not absolutely binding, the court has told you, what you decide pretty much is

the way it is going to go.

So at some point in time down the road, this man who for whatever reason on that particular day did what he did, if you find that he deserves to die, is going to be electrocuted.

. . . .

Society as a whole is brutalized. It is demeaned by the concept of capital punishment. . . . It is not as though capital punishment is part of the entire world system of justice.  It is not.  It is part of Florida law.  It doesn't mean that it is God given.

. . . .

[I]f, in fact, . . . there is a moral rightness and a moral wrongness . . . then how can you possibly condone killing someone. . . . ?

. . . .

And I also understand that people make mistakes, and I'm not so foolish as to suggest to you that this was just a mistake. This wasn't a mistake. It was a horrible, brutal act.

. . . .

I have not spent very much time arguing to twelve people not to kill someone.  So I am not experienced in this art.  I didn't bring in a fugue state with Dr. Kirkland to pretend that there was an amnesia quality about this sort of thing.  I simply brought it up to show you that we just don't have a clue why we do what we do.

And Curtis Windom doesn't deserve pity.  He doesn't deserve anything for what he did.  I agree with you, it was – I agree with Jeff, it was cold.  The two aggravating factors are that it was premeditated.  Well, that is part of the charge.  Anybody

10

that could commit first-degree murder, it is premeditated.  So that is aggravated.

And the other is that it was cold in the sense that any killing is cold. It is, by definition.  The mitigation factors you will be asked to consider, some of them don't make any sense at all.  Talks about an accomplice, so forth. That doesn't make any sense. But some of them had a lot of bearing.

Some of them talk about whether or not the individual was under extreme mental or emotional disturbance at the time.  I never told you he was crazy.  But even people testifying against him said that is not who we had seen all his life.  He was crazy, not legally insane.  You got to be frothing at the mouth to be legally insane.  But he wasn't himself.

Whatever happened on that particular day in his life, whatever bizarre configuration of relays took place that day that caused him to do this, we won't ever know.  But nobody says today, I think I'll go out and shoot four people. Something happened, and that is all they called the doctor for.

. . . .

Be honest, okay? We are talking revenge. That is all. That is the only reason we are talking about killing this man is to say we are mad at you, Curtis Windom.  You ought to be.  Society ought to be mad at him.

. . . .

As long as it is given a judicial stamp of approval, we can send twenty thousand volts through a man and fry him in a seat.  It is murder, pure and simple.  You can wrap a ribbon around it if you want to.  Killing Curtis Windom isn't going to do a single thing except endorse that philosophy that we are never going to grow up as a society.

Id. at 90-98.

The jury unanimously recommended death for all three first-degree murder counts. On 5 and 10 November 1992, the trial judge held hearings during which defense counsel was permitted to present mitigation evidence. Jerline, Windom's sister, testified that Windom saved her from drowning when she was twelve years old and he was about nine years old. Willie Mae Rich testified that she had known Windom his entire life and that he always gave her flowers or gifts on her birthday and Mother's Day; often made donations to the church they attended; helped her procure medicine she required for a respiratory condition after she was laid off from her job; bought clothes and food for the youth football team; provided for his children; and was charitable to less fortunate members of the community. She described Windom as "mild mannered" and testified that what happened in February 1992 was "really" out of character. R2-23, Appendix to State's Habeas Response, Appx. A5 ("A5") at 488. Mary Jackson, Rich's sister, testified that she had known Windom since he was three or four years old and that Windom often lent money to people in the community who were unemployed. She described Windom as a "sweet" and "low-key" person who "always offered a smile and [had] a kind word to say." Id. at 500. She had never observed him to be violent and believed he was amenable to rehabilitation. Charlene Mobley testified that she had

12

known Windom her entire life and had dated him at one time. She stated that Windom was "cool and calm" and "always smiling," that he was never physically violent towards her, and that he had helped her financially even after they ended their romantic relationship. Id. at 514-15. Julie Harp testified that she had known Windom for twenty-five years and that Windom was the father of two of her children. She related that Windom was a "great" father, who provided for and took care of his children and was never violent towards them. Id. at 519-20. At the 10 November 1992 hearing, defense counsel called John Scarlet, who testified that Windom intervened to prevent Scarlet from shooting another individual who stole twenty dollars from him.

In her sentencing order, the trial judge found two aggravating factors: (1) that Windom had been previously convicted of another capital offense or of a felony involving the use or threat of violence to a person, and (2) that the capital crimes were committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.[3] Based on witness testimony at the guilt phase that Windom "was not himself and was not acting the way he normally does," the trial judge found, but gave minimal weight to, the statutory mitigators of

---

[3] In concluding that the crime was cold, calculated, and premeditated, the court noted that there was no evidence that any of the victims had been armed or had threatened Windom in any way. Rather, Windom approached each of them without provocation and shot them at close range "with incredible accuracy." A4 at 358-59.

13

"extreme mental or emotional disturbance" and "extreme duress." A4 at 360-61.

The trial judge further found the statutory mitigator of "no significant prior criminal activity" as well as the following non-statutory mitigators: (1) Windom assisted people in the community (little weight); (2) Windom was a good father who supported and took care of his children (little weight); (3) Windom saved his sister from drowning (very little weight); and (4) Windom saved another individual from being shot during a dispute over twenty dollars (very little weight). The trial judge concluded that these mitigators were outweighed by the aggravating circumstances and thus insufficient to preclude the death penalty. Accordingly, the trial judge sentenced Windom to death for the murders of Lee, Davis, and Lubin.

C. State Post-Conviction Proceedings

Following the Florida Supreme Court's affirmance of his death sentence on direct appeal, see Windom v. State, 656 So. 2d 432 (Fla. 1995) (per curiam), cert. denied, 516 U.S. 1012, 116 S. Ct. 571 (1995),[4] Windom filed a motion for post-

---

[4]Although the Florida Supreme Court agreed that Windom murdered Lee in a cold, calculated, and premeditated ("CCP") manner without any pretense of moral or legal justification, it reversed the lower court's CCP determination as to Davis and Lubin, finding that there was no evidence that Windom planned to shoot anyone other than Johnnie Lee when he bought the gun and bullets. See Windom, 656 So. 2d at 439. The Florida Supreme Court nevertheless affirmed Windom's death sentence for all three murders, concluding that the lone aggravating factor of Windom's having been previously convicted of two other capital offenses and one violent felony against a person in each instance was sufficient to outweigh the minimal weight the trial court gave to the mitigating factors it found. See id. at 440. In so holding, the court further noted that "it is not the number of aggravating and mitigating circumstances that is critical but the weight to be given each of them." Id.

14

conviction relief pursuant to Florida Rule of Criminal Procedure 3.850. The post-conviction court summarily denied fourteen of the twenty-one claims he raised in his motion, but granted an evidentiary hearing on, <u>inter alia</u>, Windom's claims of ineffective assistance of counsel based upon (1) defense counsel's alleged failure to investigate and present mitigating evidence during the penalty phase of the trial and (2) defense counsel's alleged concession of the state's case for death during the opening and closing statements of the penalty phase.

1. <u>Evidentiary Hearing</u>

At the evidentiary hearing, Dr. Jonathan Pincus, a neurologist who conducted a neurological evaluation of Windom, testified that Windom suffered from organic brain damage and mental illness. Dr. Pincus opined that Windom's brain damage likely was caused by a traumatic head injury he suffered at birth and a car accident at age sixteen that rendered him unconscious for a substantial period of time. He testified that an individual with brain damage was much less able to resist temptations imposed by mental illness and that as a result of his brain damage, Windom's capacity to control his behavior, which was unmodulated and motivated by delusional thinking, and to distinguish between right and wrong at the time of the murders was "seriously compromised." R2-23, Appendix to State's Habeas Response, Appx. C15 ("C15") at 563-64. According to Dr. Pincus,

15

because Windom's mental illness and neurological condition made it impossible for him to premeditate properly, he believed the crimes were not planned, but were a "series of chance encounters." Id. at 564, 567.

Dr. Craig Beaver, a psychologist who performed a neuropsychological and clinical psychological evaluation of Windom, testified that Windom suffered from moderate brain dysfunction and was under a high level of stress on the day of the killings. Based on interviews with Windom's family members, who related that in the weeks before the shootings, Windom's behavior had changed abruptly and he had become increasingly paranoid, Dr. Beaver concluded that Windom's neurological and psychological limitations "came to a head" on the day of the murders and that he was under extreme emotional distress and experiencing an "acute psychotic episode" when he shot his victims. Id. at 661-63, 670. Dr. Beaver explained that the paranoia Windom was experiencing would have affected his ability to think clearly, make rational decisions, and appreciate the consequences of his actions, especially when combined with his frontal lobe brain damage.

The state's mental health expert, Dr. Sidney Merin, testified that he evaluated Windom in May 2001 and found no compelling evidence that Windom suffered from any significant brain impairment. With respect to Windom's falling

16

on his head at birth, Dr. Merin explained that this incident was fairly inconsequential "[b]ecause the brain at that age, skull at that age is very flexible, and any problems would have been . . . overcome, unless it was so severe he had to go to the hospital because there was bleeding or whatever." R2-23, Appendix to State's Habeas Response, Appx. C18 ("C18") at 1197-98. With respect to the head injury Windom sustained at age sixteen in the car accident, Dr. Merin opined that it "may have had some adverse effect, but the probabilities are that it did not," especially given that there was "no evidence of impaired behavior, other than using poor judgment" following his period of unconsciousness. Id. at 1198.

Dr. Merin noted that while persons with significant prefrontal lobe impairment very often have difficulty socializing, Windom had no trouble interacting with others prior to his arrest, and in fact was "performing very well." Id. at 1126-27. Although Windom did have a documented learning disability and did poorly in school, this was not a function of any prefrontal lobe impairment. Id. at 1128. Rather, Windom most likely had "garden variety reduced intelligence, not mental retardation . . . specific only to academic function and not to functions of how to live on the streets, the activities of daily living." Id.

Dr. Merin further indicated that while Windom was undoubtedly experiencing some level of stress at the time of the killings, he was not under

17

extreme mental or emotional disturbance when he committed the murders. Dr.

Merin observed that Windom did not lack motivation and nor was his initiative

impaired. In fact, Windom's initiative was "very adequate" and he was "quite

capable of inhibiting his behavior." Id. at 1125-26. Moreover, Dr. Merin testified,

his evaluation of Windom revealed "no evidence of breaks of reality or loosening

of ties with reality." Id. at 1130. Dr. Merin concluded that Windom had the

capacity to conform his conduct to the requirements of the law and was "quite

capable" of distinguishing between right and wrong and appreciating the

criminality of his conduct. Id. at 1200.

Dr. Richard Kirkland, the psychiatrist appointed to evaluate Windom for

competency to stand trial, testified that he conducted a clinical interview with

Windom on 17 August 1992, but was unable to make a determination regarding his

sanity at the time of the crimes because he lacked necessary information, which he

had requested but never received, regarding Windom's background. Dr. Kirkland

was not appointed during the penalty phase to evaluate Windom for statutory or

non-statutory mitigating factors, and was never advised prior to submitting his

report to the trial judge that Windom had suffered head trauma at birth and as a

teenager.

Defense counsel also called several lay witnesses to testify as to Windom's

18

background and childhood. Gloria Jean Windom, one of Windom's eight siblings, testified that they were very poor growing up and that their father physically abused them and their mother. On one occasion, their father beat their mother with a tire iron so severely that she almost died. She recalled hearing that Windom had been dropped on his head at birth and testified that at age sixteen, he was hospitalized after suffering a concussion in a car accident that caused the vehicle he was in to flip over several times. Gloria Jean further testified that Windom was meticulous about his appearance: he dressed well, bathed often, always wore clean clothes, and kept his hair closely shorn and slicked back with gel. In the few weeks leading up to the murders, however, she observed that Windom had stopped bathing and cutting or combing his hair, wore the same clothes several days in a row, and would walk around the neighborhood without a shirt or shoes. She stated that she met with Windom's trial attorneys, but they never asked her any questions about Windom's background or requested that she testify.

Eddie Lee Windom, Windom's youngest brother, testified that as a child Windom had a speech impediment and bladder control problems. Because the family was so poor and did not have a washing machine, Windom was forced to wear his urine-soaked clothes to school, prompting his classmates to tease him and call him "Pissy." R2-23, Appendix to State's Habeas Response, Appx. C16

19

("C16") at 784. He testified that their father gambled, beat them, and severely beat their mother in front of them. He also testified that as an adult, Windom was always neat, his clothes were always laundered and pressed, his shoes were shined, and he kept his hair clean and styled. Like Gloria Jean, Eddie Lee recalled that in the two or three weeks before the murders, Windom's hair was unwashed and wild, he wore the same dirty clothes day after day, walked around the neighborhood barefoot and shirtless, stopped bathing, and had become overweight. Eddie Lee stated that he met one of Windom's trial attorneys when he went to his office to pay Windom's legal fees but that Windom's attorney was too busy to talk to Eddie Lee about Windom's case.

Mae Louis Tatum, Windom's older sister, also recalled that Windom fell head-first onto a concrete floor immediately after his mother delivered him and that he was in a serious car accident when he was sixteen that rendered him unconscious and resulted in his being hospitalized for a couple of days.[5] She testified that after being released, Windom started having headaches, his speech became impaired, he became emotional with little provocation, and he was difficult to understand. Tatum met Windom's attorneys one or two times before trial but had no conversations with them regarding Windom's defense.

---

[5] Lena Windom, Curtis's mother, confirmed that upon being delivered, Curtis fell head-first onto the bathroom floor and was not examined by anyone other than a midwife.

Willie Mae Rich, Windom's neighbor, testified that she saw Windom about a month before the killings and noticed that he looked different and was acting strange. According to Rich, Windom was hyper and shaking, his eyes were "moving around in his head," his face was bloated, his hair was "kinky," he was dirty, and he was not wearing a shirt or shoes. R2-23, Appendix to State's Habeas Response, Appx. C17 ("C17") at 890-91. She testified that two or three weeks before the murders, she told Windom that she had heard a rumor that someone was planning to kill him. She said that Windom told her he had heard the same rumor.

Ed Leinster, one of Windom's trial attorneys, testified that he advised Windom to waive the mitigating factors that Windom was charitable, a good father, and kind to people in the community because he feared that the lay witness testimony establishing these mitigators would open the door to damaging rebuttal evidence that Windom was a large-scale cocaine dealer, which, according to Leinster, "prevailed the whole fabric of [the] case." C16 at 817, 829. Leinster explained that he had to tread a "thin line" because the case had been "from start to finish a cocaine case with a murder overlay" and the jury did not know about the cocaine. Id. at 833-34. Leinster also testified that he had heard rumors that Windom's girlfriend (Davis) was having an affair with Johnnie Lee and that she was an informant. Leinster feared that these rumors might be corroborated if he

21

called certain community members for mitigation purposes. Leinster stated that he was likewise reluctant to call witnesses during the penalty phase to testify that Windom was behaving uncharacteristically in the weeks leading up to and on the day of the murders because he feared presenting such testimony would run the risk of the prosecution eliciting damaging information about Windom's drug-dealing during cross-examination. Because this was a death case, Leinster stated, any information that Windom was a cocaine dealer, that his girlfriend was sleeping with one of the other victims and may have been an informant in a drug investigation involving Windom, or that Windom had had a falling out with Johnnie Lee over drug money, would have greatly damaged the defense by supplying a motive for the killings that Leinster did not want the jury to consider. Leinster admitted that he did not file a motion in limine to have to the court rule on whether this lay witness mitigation testimony would have opened the door to evidence of Windom's drug-dealing, and that he did not have a strategic reason for not filing such a motion.

With respect to his failure to present mental health experts to testify at the penalty phase as to Windom's mental state at the time of the murders, Leinster explained that he relied on Dr. Kirkland's report, which indicated that there was no viable mental health defense, and adopted the strategy of trying to implant in the

22

jurors' minds during the guilt phase of trial that Windom's state of mind on the day of the murders made him incapable of committing first-degree murder. Although the trial judge had granted his motion as to costs for a court reporter, depositions, transcripts, subpoenas, and an investigator, Leinster admitted that he never retained an investigator to look into penalty phase issues and never requested a confidential mental health expert to assist him in preparing Windom's defense. When asked whether he had a strategic reason for not asking that a confidential mental health expert be appointed, Leinster admitted, "Well, I'm sure it wasn't strategy." Id. at 820.

Leinster further testified that had he had the benefit of Drs. Pincus' and Beaver's opinions that Windom suffered from organic brain damage and mental illness, he would have introduced their testimony at the penalty phase in order to show that Windom was acting under an extreme mental and emotional disturbance when he committed the killings, *even if* this testimony opened the door for the prosecution to introduce damaging evidence that Windom dealt drugs, that Davis was rumored to have been sleeping with Johnnie Lee, and that Johnnie Lee owed Windom drug money. Leinster believed the jury should have been allowed to consider Windom's brain damage, but Leinster did not know about it. According to Leinster, the only factor suggesting possible brain damage or mental illness was

23

the nature of the acts themselves. Leinster's personal interactions with Windom would not have "tipped [him] off" because Windom was "subdued" and "was not highly emotive." Id. at 845-46. Leinster thus did not suspect that Windom was mentally impaired in any significant way. Id. at 846. Finally, with respect to Windom's claim that Leinster conceded the state's case for death during his penalty-phase opening and closing statements, Leinster testified that he was concerned about losing credibility with the jury if he challenged the first-degree murder convictions.

Kurt Barch testified that he assisted Leinster in Windom's 1992 trial and was tasked with developing information about Windom's background to be used during the penalty phase. After speaking to some of Windom's family members and several Winter Garden residents, he believed that further investigation should be undertaken, but was advised that he would have more success eliciting information if he sent a black person into the community to talk to the residents. He explained this to Leinster and asked Leinster to hire an investigator, but Leinster never did.

Barch further testified that he learned from Windom's mother and sister about the car accident Windom was in when he was sixteen and followed up with the doctor who had treated Windom. The doctor told Barch that Windom had not

24

suffered any long-term injuries as a result of the accident. Barch indicated that he did not consult with Dr. Kirkland after discovering this information because he believed Leinster was handling the mental health issues.

Finally, Barch explained that he had no responsibility for making tactical or strategic decisions and that it was Leinster's decision not to call any witnesses during the penalty phase. According to Barch, Leinster feared that if he called witnesses to testify that Windom was a good and charitable man, this testimony would open the door for the prosecution to introduce testimony that Windom earned a living gambling and selling drugs and was under investigation for drug-dealing. Barch believed Leinster wisely decided to present evidence of Windom's good character to the judge rather than to the jury.

Robert Norgard, a criminal defense attorney since 1981, testified that by 1992 it was clearly recognized under then-prevailing professional standards that in order to prepare a capital defense competently, an attorney should perform an extensive investigation of the defendant's complete life history that is not limited only to statutory mitigating factors. The professional standard of care also required a defense attorney to utilize a confidential mental health expert to assess whether there might be a basis for an insanity defense. To investigate an insanity defense properly, however, the attorney should not rely merely on the mental health expert,

25

but rather engage in a "holistic overall approach" that includes talking to "life history witnesses" to determine whether there was any prior indication of mental illness or decomposition; talking to and/or deposing any persons who saw the defendant at the time of the crimes to ascertain whether there was a change in the defendant's behavior; and obtaining school and medical records. C17 at 991-92. Norgard indicated that it is the attorney's obligation and responsibility to then provide the mental health expert with all of the information he has gathered so that the expert can more carefully and accurately assess whether the defendant suffers from a mental defect or illness. The attorney should also educate the expert regarding mitigation – both statutory and non-statutory – during the penalty phase, and his failure to do so constitutes incompetence.

Norgard conceded that there may be a valid tactical reason for presenting mitigating evidence only to the judge and not to the jury. Norgard opined that an effective attorney would first ask the trial judge to rule on whether or not a particular piece of mitigating evidence would open the door to the introduction of negative information.

Jeffrey L. Ashton, the assistant state attorney who prosecuted Windom's case, testified that in preparing for trial, he discovered facts that he believed had a bearing on Windom's motive for the killings, to wit, his involvement in a large-

scale drug-trafficking enterprise. He stated that there was an ongoing federal task force investigation, dubbed "cookie monster," into a crack-cocaine sales operation out of Winter Garden, which had resulted in several indictments. Id. at 1058. According to the information Ashton had received, Windom had been running the operation with Kenny Thames and one of the three victims. Ashton indicated that he was aware, based on the investigation, that Davis had been talking to law enforcement and that Mary Jackson had confirmed that Windom was concerned that Davis was an informant against him.[6] Ashton further testified that he "made [it] clear to everybody," including Leinster, that had the defense called a mental health expert to testify during the penalty phase, he would have presented everything in Windom's background that was unfavorable, including prior arrests and crimes, for the jury to consider in deciding how much weight to give any mitigating factor. Id. at 1064-65, 1079-80. According to Ashton, Leinster's decision not to call Dr. Kirkland or another mental health expert during the penalty phase made it impossible for the state to introduce this damaging evidence to the jury. Id. at 1080.

---

[6] Ashton testified that the decision was made not to prosecute Windom federally because that would require complex drug involvement allegations, whereas Windom could be tried in state court for premeditated murder without the prosecution having to prove any of the drug-related crimes.

2. Order on Rule 3.850 Motion

The state post-conviction court first found that Leinster knew about Windom's difficult background, including that Windom had suffered head injuries at birth and as a teenager, and made a strategic decision not to mount a mitigation defense during the penalty phase because he did not want to open the door to the prosecution offering evidence of Windom's involvement in "a violent world of drug dealing." R2-23, Appendix to State's Habeas Response, Appx. C26 ("C26") at 2646. Faced with the possibility that the prosecution would introduce rebuttal evidence of Windom's drug dealing, Leinster made a reasonable strategic decision to argue to the jury in the penalty phase that Windom seemed crazed and not like himself on the day of the shootings.

The court found that Windom was not prejudiced by Leinster's failure to present mental health mitigating evidence in any event because, when weighed against the effect of potentially devastating rebuttal testimony showing that Windom shot his victims because he believed they were informants or owed him drug money, the beneficial effect of Drs. Pincus' and Beaver's mitigating testimony would have been negligible. In finding further that the doctors' testimony was of limited value, the court noted that "their opinions were, at least in part, based on facts not entirely supported by the evidence," because while they

concluded that Windom had no plan to do what he did and that the killings were the result of a series of chance encounters, the evidence adduced at trial and the evidentiary hearing "suggest[ed] that the first three persons were shot over drug money and in revenge for Mr. Windom's belief that these people were police informers." Id. at 2636. In fact, the court found,

> [b]oth doctors seemed to have ignored Mr. Windom's own statements on the day of the murders, which would seem to belie Dr. Pincus' conclusions that these murders were merely a series of chance encounters with Mr. Windom acting out of momentary impulse . . . The totality of the circumstances surrounding these events suggest[s] to me in no uncertain terms that Mr. Windom's actions were knowing and premeditated.

Id. at 2640-41. Further, the court pointed out, both doctors

> based their finding of brain damage, at least in part, upon Mr. Windom's history as related by himself and his family. Now, some nine years after the fact, Mr. Windom and his family relate, in graphic detail, Mr. Windom's difficulties following his fall to a concrete floor quite literally from his mother's womb and a rollover traffic accident at the age of 16. While there is a wealth of evidence to suggest that Mr. Windom suffered from low IQ, depression, and a bipolar disorder, there is virtually no evidence to suggest that Mr. Windom had any trouble functioning prior to the date of these murders. Virtually no medical records existed to verify either of the head injuries now claimed by Mr. Windom. Mr. Windom's family says that after his vehicle injury at the age of 16, he became more paranoid and failed to interact much with anybody. This appears to be a part of what the doctors based their conclusions upon. Yet in the evidentiary hearing, Mr. Windom's family testified that prior to this event, he was well-groomed, affable, and took pride in his appearance. One story seems to contradict the other.

Id. at 2638-39.

The court also noted that in formulating their opinions, the doctors were either unaware of, or ignored, Windom's lifestyle and the "violent social setting within which Mr. Windom lived at about the time the shooting occurred," including that Windom had himself been previously shot in a drive-by shooting, his house had been ransacked, he had been arrested a few months before the murders, and his drug sales partner had been tortured and killed shortly after the murders. Id. at 2640-42. Had the doctors taken into consideration these realities, "they might have believed that Mr. Windom's 'edgy' demeanor was more likely a realistic assessment of the setting in which he lived, rather than a product of irrational paranoia or delusion." Id. at 2640. According to the court, the context within which Windom committed his crimes thus showed that "Windom's acts were arguably more a product of the drug culture within which he lived, than any mental infirmity." Id. at 2642.

On the other hand, the court found, the testimony of Dr. Merin was "more logically based [on] and consistent with the facts." Id. at 2641. Given the inconsistencies between the doctors' testimony and the record facts, especially when weighed against the more credible testimony of Dr. Merin – which did not suggest that Windom was suffering from brain damage or mental impairment at the

30

time of the offenses – the court concluded as follows:

> [t]here is no reasonable probability that the guilt phase
> would have resulted in a different outcome if experts such as Dr.
> Pincus and Dr. Beaver had been prepared and called by Mr.
> Leinster. Their conclusions seemed contrived, and were based
> upon speculation about Mr. Windom's state of mind on the day
> of the shooting. Their conclusions ignored much of the trial
> record evidence of Mr. Windom's statements on the day of the
> shootings which indicated that he knew what he was doing and
> had motives for his shooting the victims.

Id. at 2641. Finally, the court concluded that the prosecution's potential rebuttal
evidence that Windom successfully ran a lucrative illicit drug enterprise not only
would negate a finding of brain damage, but would suggest that Windom in fact
had a much higher level of intellectual functioning.[7]

With respect to Windom's claim that defense counsel conceded aggravating
factors during the penalty phase, the post-conviction court found that

> Mr. Windom had already been convicted of first-degree
> premeditated murder, and Mr. Leinster was faced with a daunting
> task . . . . It would have strained his credibility, thereby
> contributing to the difficulty of his task, to argue the verdict was
> unjust to the same jury which would be imposing a sentence. It
> was a reasonable trial strategy for Mr. Leinster to be realistic

---

[7] While the court agreed that Leinster should have filed a motion in limine asking the
judge to rule on whether mitigation would open the door to this negative evidence, it found that
even if Leinster had filed such a motion, he would not have prevailed because no judge would
allow mitigation evidence suggesting brain damage and an inability to function independently
without also allowing rebuttal evidence suggesting that the defendant was a successful drug
dealer, had a motive for killing his victims (who were police informants and interfered with his
drug operation), and had a premeditated design to kill those victims as explained to witnesses
before the murders.

about the facts of the case in order to restore a measure of credibility to the defense.

Id. at 2651. The court further found that the record demonstrated that Leinster "argued vigorously *against* the death penalty in general and argued that executing Mr. Windom would be just another act of murder." Id.

After analyzing the remainder of Windom's claims, the court reiterated that, even if Windom could show that trial counsel's representation was unreasonable under prevailing professional norms, his motion nevertheless was due to be denied because he failed to establish that he suffered any actual prejudice as a result of counsel's deficient performance. Specifically, the court concluded that:

> In this court's review of all of the evidence and testimony presented, it is unable to determine that there is a reasonable probability that the outcome of the trial would have been different had the prejudicial acts and omissions complained of not occurred. In other words, Mr. Windom is unable to prove the second prong (prejudice) of Strickland. I acknowledge that several of the acts and/or omissions complained of are troubling. Mr. Windom's argument that prior counsel made only a minimal attempt, just before the trial, to investigate and prepare available mitigating evidence certainly has some merit. Collateral counsel's legal capital expert, Mr. Norgard, testified that it was appropriate to do an extensive investigation of a person's life, with an expenditure of up to 500 hours of time on this element. Collateral counsel is correct when it argues that the time spent investigating by trial counsel did not even approach that milestone. Even so, this would not have been enough. While there is certainly some evidence to support many of these allegations, none of it provides proof by a preponderance that trial counsel was ineffective . . . . It certainly did not provide

32

proof by a preponderance of the evidence that Mr. Windom suffered prejudice as a result of trial counsel's alleged ineffectiveness.

Defendant's trial attorney faced almost insurmountable evidence that Mr. Windom shot five people in a premeditated manner. Mr. Windom made statements to a credible witness, Jack Luckett, who indicated that he had more than one motive to kill Johnnie Lee, his first victim. Mr. Windom also told Mr. Luckett that he would see him in the papers, indicating that he knew the probable outcome of shooting someone in broad daylight. Mr. Windom then obtained the firearm, went to a Wal Mart and purchased ammunition, and shot Mr. Lee. At the point in time he shot Mr. Lee, Mr. Windom made a statement which suggested a motive which matched that which he had told Mr. Luckett earlier. Mr. Windom then shot four additional persons with sufficient time between each shooting to consider the nature and consequences of his acts. Before he shot the third victim, Kenny Williams, Mr. Windom took time to reload his gun. This gave him even more time to consider the nature and consequences of his shooting Mr. Williams and his last victim, Mary Lubin. While he was shooting Mr. Williams, Mr Windom again made a statement which indicated his motive for doing so, to wit, that he did not like police informants. This matched the fact that Mr. Windom was facing drug charges rising out of cases in which police had used informants close to Mr. Windom. Before he shot his last victim, Mr. Windom made a statement that he knew what he had done ("I shot Johnnie Lee"), and acted as if he knew this action was wrong (putting his gun up to his own head). Mr. Windom's actions were consistent with other evidence introduced at the evidentiary hearing which suggested that his shootings were consistent in character and motivation with similar crimes committed by others who shared his values and lifestyle as a drug dealer.

There was also evidence that his trial attorney, Mr. Leinster, was familiar with this environmental setting, and knew the prosecutor was also familiar with it. Thus, Mr. Leinster

33

adopted a strategy designed to keep the defendant's lifestyle out of evidence at the guilt and penalty phases. Ultimately, Mr. Leinster's strategy failed to win over the jury or the sentencing judge. It is certainly clear that another route could have been taken by defense counsel at the guilt and penalty phases; that currently suggested by collateral counsel. Having now heard that evidence which could have and would have been presented with a more thorough investigation, and with medical witnesses testifying about Mr. Windom's brain damage, I am unable to envision a different outcome.

Given these facts, Mr. Windom has failed to prove that his attorney was ineffective, or that a different result would have been obtained either at the guilt or penalty phases, even if Mr. Leinster had acted as defendant now claims that he should have. At the evidentiary hearing, expert medical witnesses failed to prove a reasonable probability that a mental health status defense would have been successful at either phase of the trial. Their conclusions were unpersuasive, and ignored the ample evidence that Mr. Windom had thought over his reasons for shooting his victims.

Id. at 2665-67.

On appeal, the Florida Supreme Court upheld the post-conviction court's finding that penalty-phase counsel was not deficient for failing to present the mental health experts' testimony and the testimony of Windom's family members regarding Windom's impoverished upbringing and the two head injuries he sustained as a child. See Windom v. State, 886 So. 2d 915, 928 (Fla. 2004) (per curiam). It reasoned that the evidence the state would have offered in rebuttal greatly outweighed any value of the mental health expert and lay witness testimony

34

and "would have directly countered any assertion of brain damage by showing that Windom was capable of running a successful drug enterprise and that his everyday functioning was not impaired." Id. Accordingly, it found that Leinster made a reasonable tactical decision not to present the doctors' and family members' testimony in order to prevent the jury from hearing this damaging rebuttal evidence. See id.

With respect to trial counsel's alleged concession of the state's case for death, the Florida Supreme Court found that Leinster's testimony at the evidentiary hearing made clear that he made a strategic decision to focus his efforts on conveying to the jury that Windom was not acting like himself on the day he committed the murders and did not deserve the death penalty. See id. at 929. The court further agreed with the post-conviction court's finding that Windom was not prejudiced by Leinster's remarks because the sentencing record demonstrated that "[Leinster] argued vigorously *against* the death penalty in general and argued that executing Mr. Windom would just be another act of murder." Id.

D. Federal Habeas Petition

Windom filed the instant § 2254 petition for a writ of habeas corpus in the district court on 14 September 2004, reasserting his claim that penalty-phase counsel was defective for (1) failing to call Drs. Pincus and Beaver as mental

health experts to testify that he suffered from mental illness and organic brain damage; (2) failing to call lay witnesses to support the findings of the mental health experts and to testify as to non-statutory mitigation, including his background; and (3) conceding the state's case for aggravation by stating, inter alia, that Windom "[didn't] deserve pity. . . . I agree with [the prosecutor], it was cold," and reminding the jury that "You made your decision, it wasn't too tough. Broad daylight, what can you say? I would have to be the firm of Christ and Houdini to have made anything out of this other than what it clearly was." R1-1 at 11-22, 43. Windom argued that in making these remarks, failing to present mitigating evidence, and indicating that no mitigation existed, defense counsel implicitly urged the jury to return a death recommendation and thereby abandoned his role as an advocate.

District Court Order on § 2254 Petition

a. Failure to Investigate and Present Statutory and Non-statutory Mitigation Evidence[8]

The district court first rejected Windom's claim that the state court's decision was contrary to clearly established law because it failed to apply the Supreme Court's ruling in Wiggins v. Smith, 539 U.S. 510, 123 S. Ct. 2527

---

[8] The district court found that although Windom agreed to waive the presentation of mitigation evidence to the *jury*, he did not waive the presentation of mitigation evidence to the *judge*. We agree.

36

(2003), which, Windom argued, was controlling.  The district court found that

Wiggins was distinguishable because the aggravating circumstances in Windom's

case were "extremely strong."  R3-32 at 39.  Unlike the mitigating evidence at

issue in Wiggins, which included that the petitioner had suffered severe privation

and abuse at the hands of his alcoholic mother and had been physically abused,

sexually molested, and repeatedly raped during his years in foster care, and which

was untainted by any prior record of misconduct by petitioner, the mitigating

evidence Windom asserts should have been presented in his case had a "'double

edge.'"  Id.; see Wiggins, 539 U.S. at 535, 123 S. Ct. at 2542.[9]  The district court

---

[9] We agree with the district court that Wiggins does not control the outcome of this appeal.  In Wiggins, the Supreme Court had to decide whether counsel conducted a reasonable investigation into the petitioner's background before deciding not to introduce mitigating life history evidence during the penalty phase of petitioner's capital murder trial.  539 at 516, 523, 123 S. Ct. at 2532, 2536.  The Court clarified that under Strickland "a cursory investigation" does not "automatically justif[y] a tactical decision with respect to sentencing strategy," and that when deciding whether counsel exercised reasonable professional judgment under the first Strickland prong, the relevant inquiry is not whether counsel should have presented a mitigation case, but rather, "whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . *was itself reasonable*."  Id. at 522-23, 527, 123 S. Ct. at 2536, 2538.  Disagreeing with the state court's finding that counsel was not ineffective because they made a strategic decision to focus their efforts on arguing that the petitioner was not directly responsible for the murder, the Court held that "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources" and therefore, their "alleged choice" not to present a life history mitigation defense, inasmuch as it was based on an unreasonable investigation, constituted deficient performance.  Id. at 524, 527, 123 S. Ct. at 2537-38.  The Court further held that the lack of aggravation, coupled with the strength of the mitigating evidence, rendered defense counsel's failure to conduct an adequate investigation prejudicial.  Id. at 536-38, 123 S. Ct. at 2543-44.  In this case, however, we find, for the reasons discussed in more detail below, that even if counsel's investigation into a mitigation defense was unsatisfactory under the standards set forth in Strickland and reaffirmed in Wiggins, the existence and weight of aggravating factors, coupled with the relative weakness of the mitigating factors, nevertheless compels a finding of no

37

further found that the state courts' decision did not involve an unreasonable application of the prejudice prong of Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).[10]  The district court agreed with the state post-conviction court that the state's case for aggravation was virtually unassailable in light of the overwhelming evidence of premeditation, and that the mitigating evidence of Windom's brain damage and mental illness would have been greatly diminished by the state's rebuttal evidence of Windom's drug dealing.  Because nothing in the record or in Windom's submissions suggested that the state courts' factual findings in this regard were unreasonable, Windom failed to rebut the presumption of correctness accorded those findings.

b.      Trial Counsel's Penalty-Phase Opening Statement and Closing Argument

The district court first concluded that the state courts' finding that Leinster's

---

prejudice.

[10] The district court noted that while the "key" to the state courts' decision that penalty-phase counsel was not ineffective was their finding that counsel made a strategic decision not to mount a mitigation defense in order to prevent the jury from hearing evidence of Windom's involvement in drug-dealing, "Leinster could not have had similar concerns regarding the judge hearing evidence of drug dealing[,] as Leinster presented mitigation evidence to the judge that did open the door to certain drug evidence."  R3-32 at 31, n.10.  Therefore, according to the district court, "Leinster's failure to present available mitigation evidence *to the judge* regarding Windom's difficult upbringing and intellectual and mental health issues [could not] be attributed to strategy."  Id.  The court acknowledged that "a deficiency analysis [was] unnecessary to the resolution of this claim" in light of its finding that Windom was not prejudiced by counsel's performance, but indicated that "[it] ma[de] these observations to again stress that it does not condone the roughshod approach taken by Windom's counsel...."  Id.

38

comments, when considered in context, "reflect[ed] an acceptable effort to regain credibility with the jury," was a reasonable application of the first prong of Strickland. R3-32 at 46. The district court further agreed with the state courts' finding that Leinster did not concede a lack of mitigation, noting that the record showed that Leinster made a "valid argument that the jury should find the mitigating circumstance of extreme mental or emotional disturbance based upon testimony of the State's own witnesses who described Windom on that day as different from the way he had been all of his life." Id. at 47. The district court disagreed, however, with the state courts' conclusion that Leinster's concession of the existence of CCP constituted a "reasonable trial strategy . . . to be realistic about the facts of the case in order to restore a measure of credibility to the defense." Id. (quotation marks and citation omitted). Noting that there could have been no conceivable benefit to trial counsel conceding one out of only two aggravating circumstances on which the jury was instructed, the court concluded that Leinster's concession that CCP applied "'by definition'" reflected an "obvious misapprehension of the law" and therefore could not be "a reasonable" strategy." Id. at 48. Nevertheless, the court found, the state courts' finding that Windom was not prejudiced by Leinster's improper concession of the CCP aggravator was not an unreasonable application of Strickland and thus Windom was not entitled to

39

relief.

## II. DISCUSSION

On appeal, Windom argues that the state court's decision that Leinster's performance was constitutionally adequate was erroneous because it rested upon the factually flawed premise that the state would have presented rebuttal drug evidence. He asserts that the only evidence of Windom's drug-dealing activity and alleged motive for the killings was Ashton's testimony at the post-conviction evidentiary hearing and that the state offered no other evidence of his drug-dealing ventures. Windom also asserts that if Ashton had in fact had evidence that the killings were motivated by Windom's involvement in drug-dealing activities, he could have introduced this evidence without the defense first opening the door. He further points out that had there been evidence that these crimes were related to Windom's drug activity, the case would have proceeded in federal court under the federal death penalty statute.[11]

Windom further challenges the state courts' finding that he was not prejudiced by Leinster's failure to call mental health experts because their

---

[11] We reject Windom's assertion that the state courts' decision improperly ignored Leinster's own admission of deficient performance at the evidentiary hearing. Because the adequacy of an attorney's performance is measured against an objective standard of reasonableness, the fact that trial counsel admits that his performance was lacking is of little, if any, consequence. See Chandler v. United States, 218 F.3d 1305, 1315 n.16 (11th Cir. 2000) (en banc).

testimony lacked credibility. He asserts that the experts *were* aware of Windom's alleged drug activity and violent social setting, and, in any event, that the courts failed to explain how ignorance of Windom's drug-related activities undermined their credibility. Windom contends that the courts also erroneously found that the experts ignored Windom's statements on the day of the killings, arguing that both testified that they were aware of these statements and considered them in formulating their opinions. Windom further asserts that the state and district courts gave undue weight to evidence of Windom's drug activity in finding a lack of prejudice because there was so little actual evidence of such activity. Finally, Winsom contends that the district court failed to assess all of the mitigation presented by Windom because it cited only brain damage, mental illness, and charitable acts, and failed to weigh the fact that Windom was physically abused and raised in poverty. Id. at 25.

As to his second claim, Windom asserts that the state and district courts misconstrued his argument as one challenging Leinster's decision not to argue innocence when in fact his argument was that Leinster conceded CCP and the justification for a death sentence. Conceding the state's case for aggravation could not be reasonable strategy under any circumstance, he argues, and therefore, his remarks were unnecessary to gain credibility with the jury. Because Leinster never

asserted that Windom was innocent, he contends, there was no reason to regain credibility. In any event, even if gaining credibility were necessary, conceding the existence of an aggravating factor was not an appropriate way to accomplish such a goal. Finally, he asserts, Leinster only vaguely referenced the statutory mental-health mitigator, never asserted that it applied, and never argued that it, or any other mental health mitigator, existed.

Because Windom filed his federal habeas petition after 24 April 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA's "highly deferential standard for reviewing state court judgments," a federal court may not grant habeas relief on claims previously adjudicated on the merits by a state court unless the state court adjudication resulted in a decision that was "(1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." McGahee v. Ala. Dep't of Corr., 560 F.3d 1252, 1255 (11th Cir. 2009) (quotation marks, alterations, and citation omitted); 28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established federal law if it "applies a rule that contradicts the governing law set forth in [Supreme Court]

42

cases" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Court's]." Williams v. Taylor, 529 U.S. 362, 405, 120 S. Ct. 1495, 1519 (2000). If the state court decision is not contrary to clearly established federal law, the reviewing court must then determine whether the state court decision was an "unreasonable application" of clearly established federal law. Id. at 413, 120 S. Ct. at 1523. A state-court decision involves an unreasonable application of federal law where "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." Id. It is not sufficient that the state court's application was incorrect; the misapplication must also be objectively unreasonable. See id. at 410-11, 120 S. Ct. at 1522. A state-court decision also involves an unreasonable application of federal law where the state court "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407, 120 S. Ct. at 1520.

Even if the state court's decision was neither contrary to nor an unreasonable application of clearly established federal law, the district court may grant habeas relief if the state court's decision "was based on an unreasonable determination of

the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). However, the state court's factual determinations are presumed correct and the petitioner can rebut this presumption only with clear and convincing evidence that the state court's factual determinations were erroneous. See 28 U.S.C. § 2254(e)(1). "[T]he statutory presumption of correctness applies only to findings of fact made by the state court, not to mixed determinations of law and fact." Parker v. Head, 244 F.3d 831, 836 (11th Cir. 2001).

A defendant claiming ineffective assistance of counsel in violation of the Sixth Amendment must demonstrate that: (1) counsel's performance was deficient, *and* (2) the deficient performance prejudiced the outcome of the proceedings. See Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id. We have observed that under the exacting rules and presumptions set forth in Strickland, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." Waters v. Thomas, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc) (quotation marks and citation omitted).

Because the failure to demonstrate either deficient performance or prejudice

is dispositive of the claim against the petitioner, "there is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697, 104 S. Ct. at 2069. Accordingly, we may consider whether the petitioner suffered prejudice as a result of counsel's alleged errors without first evaluating the adequacy of counsel's performance. See id.; see also McClain v. Hall, 552 F.3d 1245, 1251 (11th Cir. 2008) ("We may decline to decide whether the performance of counsel was deficient if we are convinced that [the petitioner] was not prejudiced"). In fact, the Supreme Court has made clear that "[t]he object of an ineffectiveness claim is not to grade counsel's performance" and therefore, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697, 104 S. Ct. at 2069.

A.     Failure to Investigate and Present Mitigating Evidence

We need not determine whether counsel's limited investigation into Windom's background and mental health constituted deficient performance under the first prong of Strickland because we conclude that, even assuming counsel performed deficiently, Windom was not prejudiced thereby.

Under the prejudice prong of the Strickland analysis, our inquiry is "whether

there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695, 104 S.Ct. at 2069. In conducting our review, we must "reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins, 529 U.S. at 534, 123 S. Ct. at 2542. When balancing the aggravating and mitigating factors, we presume the state court's findings of fact to be correct. Porter v. Att'y Gen., 552 F.3d 1260, 1269-70 (11th Cir. 2008) (per curiam).

Prior to imposing sentence, the trial judge heard evidence that Windom was charitable, was a good father, saved his sister from drowning, and prevented a violent encounter. The question we must answer is whether, when weighed against the aggravating circumstances – CCP and previous conviction for a capital offense or violent felony with regard to the murder of Lee, and previous conviction for a violent felony or capital offense with regard to the murders of Davis and Lubin – this evidence, in combination with the mitigation evidence presented by collateral counsel during the evidentiary hearing, would have precluded imposition of the death penalty. See Wood v. Allen, 542 F.3d 1281, 1310 (11th Cir. 2008) (in evaluating prejudice, the court "must consider the total available mitigation evidence as adduced pre-trial, at trial, and at the [post-conviction] hearings").

At the Rule 3.850 hearing, Drs. Pincus and Beaver testified that Windom suffered from organic brain damage and mental illness, was of low intelligence, and was not capable of appreciating the criminality of his conduct at the time he committed the murders. Windom's family members testified that he was dropped on his head on a concrete floor at birth and was hospitalized with a head injury after being in a car accident at age sixteen. They also testified that Windom had a difficult and impoverished upbringing, during which he was physically abused by his father and bullied by his classmates, and that he had been behaving erratically in the weeks leading up to the shootings.

The state post-conviction court found that the outcome of the penalty phase proceedings would not have been different had Leinster presented this mitigating evidence given the overwhelming evidence of premeditation, including that Windom: (1) told Luckett he would read about [Windom] in the papers; (2) obtained a gun and purchased ammunition at a local Wal Mart; (3) shot three people with sufficient time between each shooting to consider the consequences of his actions; (4) reloaded his gun before shooting Williams; and (5) stated, while shooting Williams, that he did not like police informants. The state court noted further that the expert medical witness testimony presented by collateral counsel at the evidentiary hearing did not establish that a mental health status defense would

47

have been successful because the experts' "conclusions were unpersuasive, and ignored the ample evidence that Mr. Windom had thought over his reasons for shooting his victims." C26 at 2667.

The state post-conviction court's conclusion that Windom was not prejudiced by Leinster's failure to investigate and present a mental health mitigation defense was not objectively unreasonable.[12] As the state court pointed out, Drs. Pincus' and Beaver's opinions were inconsistent with portions of the record evidence, lacked a medically verifiable foundation, e.g., hospital records confirming that Windom in fact suffered head trauma leading to brain damage, and were largely controverted by Dr. Merin's testimony that Windom was not suffering from any mental impairment when he committed the murders. It would therefore strain reason to conclude that the doctors' testimony would have had much impact on the judge's choice of sentence. See Hannon v. Sec'y, Dep't of Corr., 562 F.3d 1146, 1157 (11th Cir. 2009) (petitioner not prejudiced by counsel's failure to investigate petitioner's alleged mental health impairment where there was contrary evidence presented by the experts). Rather, it is entirely conceivable, if not probable, that the trial judge would have rejected Drs. Pincus' and Beaver's

---

[12] In upholding the post-conviction court's decision that Windom failed to establish an ineffective assistance of counsel claim based on Leinster's failure to present mitigating mental health evidence, the Florida Supreme Court concluded that Leinster's performance was not deficient, and thus never addressed the post-conviction court's findings with respect to prejudice.

48

testimony in favor of Dr. Merin's conclusions to find that Windom did not suffer a mental impairment that diminished his moral culpability for the crimes he committed. See Waters, 46 F.3d at 1514-15 (where psychologist's testimony was contradicted by the opinion of the state's expert and inconsistent with petitioner's conduct on the day of the murders, counsel's failure to present the testimony was not deficient performance because the psychologist's "credibility probably would have been undermined to such an extent that it would have rendered worthless the testimony she did give for the defense"). It is also unlikely, given Dr. Merin's unequivocal testimony that Windom was capable of distinguishing between right and wrong and appreciating the criminality of his conduct, that the trial judge would have accorded any significant weight to the family members' testimony that Windom was behaving strangely in the weeks before the shooting as persuasive evidence of a mental impairment.

With respect to the other mitigators Windom asserts should have been presented, including that he was physically abused by his father, bullied by his classmates, and raised in abject poverty, Windom offered no evidence that these circumstances had any continuing effect on his ability, at the age of twenty-six, to conform his conduct to the requirements of the law.

We also find that Windom's background, though dysfunctional, was not so

adverse or atrocious as to create a reasonable probability that it would "have influenced the [trial judge]'s appraisal of [Windom]'s moral culpability." Wiggins, 539 U.S. at 538, 123 S. Ct. at 2544 (quotation marks and citation omitted). In Wiggins, the Supreme Court held that the mitigating evidence counsel unreasonably failed to discover and present, including that: (1) the petitioner's mother was a chronic alcoholic and was physically abusive; (2) the petitioner and his siblings were left home alone without food and were forced to beg for food and to eat paint chips and garbage; (3) petitioner was hospitalized after his mother intentionally burned him on a hot stove; (4) petitioner's mother had sex with men while petitioner was in the same bed; (5) petitioner was placed in foster care at age six and was physically abused by his foster mother; (6) petitioner was raped and molested by one foster father and gang-raped by the sons of another foster mother; (7) petitioner was homeless after running away from one abusive foster home; and (8) petitioner was allegedly sexually abused by a supervisor after entering a Job Corps Program, was "powerful" and reflected "the kind of troubled history . . . relevant to assessing a defendant's moral culpability." Id. at 516-17, 534-35, 123 S. Ct. at 2533, 2542. In view of the nature and extent of abuse and deprivation to which Wiggins was subjected, the Court concluded that there existed a reasonable probability that, had the jury been given the opportunity "to place

50

[Wiggins'] excruciating life history on the mitigating side of the scale, there [was] a reasonable probability that at least one juror would have struck a different balance." Id. at 537, 123 S. Ct. at 2543; see also Williams, 529 U.S. at 398, 120 S. Ct. at 1515 (finding prejudice where counsel failed to present evidence of petitioner's childhood, which was "filled with abuse and privation"); Williams v. Allen, 542 F.3d 1326, 1342-43 (11th Cir. 2008) (finding prejudice where trial counsel failed to discover mitigating evidence that petitioner suffered "an extreme level of deprivation, both physical and emotional," and was subjected to severe beatings, which involved the use of deadly weapons and resulted in serious injuries, "on a near constant basis").

The mitigation evidence in this case, unlike the "powerful mitigating narrative" told by the gruesome circumstances of Wiggins' background, is far less compelling in light of the number and method of the killings involved here. Wiggins, 539 U.S. at 537, 123 S. Ct. at 2543. Moreover, any potential benefit to be gained by presenting the relatively weak mitigating evidence in Windom's case would have been severely undercut by rebuttal evidence of his own misconduct, specifically, his involvement in a large-scale drug-dealing operation. Cf. id. (noting that counsel's failure to present evidence of Wiggins' disturbing background was rendered even more prejudicial by the fact that Wiggins had no

record of violent conduct against which to offset the strong mitigating evidence); Williams, 542 F.3d at 1343 (noting that the fact that the case was not highly aggravated "[f]urther support[ed] a finding of prejudice").

In sum, given the strength of the state's case against Windom and the nature of the crimes themselves, there is no reasonable probability that the jury would have recommended, or that the judge would have imposed, a non-death sentence even if they had been confronted with the mitigating evidence Windom asserts Leinster should have discovered and introduced. See Payne v. Allen, 539 F.3d 1297, 1318 (11th Cir. 2008) (where "[t]he strength of the evidence of both [petitioner's] guilt and the aggravating nature of the crimes [was] great[,] . . . mitigating evidence about [petitioner's] childhood, family background, and substance abuse would not have negated the aggravating nature of this abhorrent murder proven beyond all doubt by the State"). Accordingly, we agree with the district court that the state court did not unreasonably apply Strickland when it found that the available mitigating evidence, taken as a whole, did not outweigh the aggravating nature of Windom's crimes and that Windom thus failed to establish prejudice as a result of his counsel's failure to investigate and present mitigating evidence.

B.      Penalty-Phase Counsel's Opening and Closing Statements

The state courts' finding that Leinster's comments did not constitute deficient performance was not an unreasonable application of the first prong of Strickland. At the evidentiary hearing, Leinster testified that he made the challenged remarks because he was concerned about losing credibility with the jury if he disputed its first-degree murder conviction by arguing that Windom did not act in a premeditated manner. As the district court pointed out, the Supreme Court has recognized that counsel is not deficient for being candid about his client's crimes and unwilling to challenge the jury's finding of guilt. See Florida v. Nixon, 543 U.S. 175, 190-92, 125 S. Ct. 551, 562-63 (2004). Further, the record does not support Windom's assertion that Leinster conceded a lack of mitigation. In fact, it shows that Leinster affirmatively argued for the existence of the statutory mitigating circumstance of extreme mental or emotional disturbance at the time of the offense. While Leinster noted that some of the mitigation factors "don't make any sense at all," he stated that "some of them had a lot of bearing," and reminded the jury that several witnesses who observed Windom on the day of the murders testified that Windom "[was] not who [they] had seen all his life. He was crazy . . . [h]e wasn't himself." A1 at 96-97. Leinster further argued that "we won't ever know" what happened on the day of the murders inside Windom's mind, or "whatever bizarre configuration of relays took place that day that caused

53

him to do this," because "nobody says today, I think I'll go out and shoot four people. Something happened, and that is all they called the doctor for." Id.

The state court's conclusion that Windom suffered no prejudice as a result of Leinster's remarks also was not objectively unreasonable. As noted above, given the strength of the state's case for aggravation and the brutal nature of Windom's crimes, we do not believe that a different closing argument would have resulted in a lesser sentence or that Leinster's remarks in any way undermined the reliability of the jury's death recommendation.

### III. CONCLUSION

The district court correctly denied Windom's petition for habeas relief as to both claims of ineffective assistance of counsel. Given the aggravating nature of Windom's crimes and the state's potential rebuttal evidence, we find there to be no reasonable probability that the judge or the jury, even if confronted with all available mitigating evidence related to Windom's mental health problems, troubled upbringing, or social background, would have concluded that this evidence was of sufficient weight to preclude imposition of a death sentence. Windom also failed to establish that trial counsel's statements during opening and closing arguments reflected an abdication of counsel's duty of advocacy or, even if they were improper, that he was prejudiced thereby. Accordingly, the judgment of

54

the district court is **AFFIRMED.**