[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-13569
_____

D.C. Docket No. 1:09-cv-00069-TWT

KELLY RENEE GISSENDANER,

Petitioner-Appellant,

versus

KATHY SEABOLDT,
Warden, Metro State Prison,

Respondent-Appellee.
_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(November 19, 2013)

Before CARNES, Chief Judge, TJOFLAT and JORDAN, Circuit Judges.

CARNES, Chief Judge:

The tumultuous relationship between Kelly and Douglas Gissendaner was marked by marriage, divorce, remarriage, separation, reconciliation, and a string of

extramarital affairs on her part. After eight years of matrimonial and quasi-matrimonial turmoil, Gissendaner coaxed her on-again, off-again paramour, Gregory Owen, to kill her on-again, off-again husband. Although Owen suggested the less violent alternative of divorce, Gissendaner insisted that her husband be killed so that she could collect insurance money and because she believed that it would ensure that she would be done with him once and for all. See Gissendaner v. State, 532 S.E.2d 677, 682, 691 (Ga. 2000). Before that, Gissendaner had told Owen's sister that she planned to use her husband's credit to buy a house and then would "get rid of him." Id. at 682.

On the night of February 7, 1997, Gissendaner drove Owen to her home, gave him a nightstick and a large knife to use as murder weapons, and left him in the house to lie in wait for her husband while she went to a nightclub with some friends. Id. at 682, 691. When Douglas Gissendaner arrived home later that night, Owen ambushed him from behind, held the large knife to his throat, and forced him to drive his car to a remote wooded location that Gissendaner herself had selected. See id. at 682. At that location, Owen ordered Douglas to walk into the woods and kneel on the ground. Id. As Gissendaner had instructed him, Owen removed Douglas' watch and wedding ring to make the murder look like it was part of a robbery. Id. Owen then struck him in the back of the head with the

2

nightstick and, after he fell face first onto the ground, repeatedly stabbed him in the back and neck with the knife.

Gissendaner returned home from the nightclub while her husband's murder was being carried out, paged Owen with a numeric signal indicating that she was on her way to the crime scene, and then drove there. She met Owen beside the woods and asked if her husband was dead. After being told that he was, she walked into the woods with a flashlight to make sure. Meanwhile, Owen drove Douglas' car three-quarters of a mile down the road, where Gissendaner later helped him set fire to it with kerosene that she had brought to the scene in her own car.

Gissendaner reported her husband missing to the police the next day, but the police were unable to locate his body until February 20, 1997, nearly two weeks after the murder. By that time Douglas' remains had been subjected to the elements and ravaged by animals. While her husband was still missing, Gissendaner tried to conceal her relationship with Owen from the police and claimed not to have initiated any contact with him for some time, a claim refuted by phone records showing that she had called and paged Owen a total of 65 times in the days leading up to her husband's murder. She was arrested on February 25, 1997, based on statements Owen made to the police confessing his involvement and implicating her in the murder.

Following her arrest, Gissendaner told her best friend, Pamela Kogut, about her active role in the murder.  She later told Kogut that she had been coerced into taking part in the crime.  While in jail awaiting trial, Gissendaner wrote a letter to a fellow inmate, Laura McDuffie, which included a diagram of her house, outlined a fictional scenario in which she and her husband had been victimized by Owen and an unidentified third person, and offered to pay several thousand dollars to any person willing to falsely claim to have been Owen's accomplice in the imaginary plot.  In her letter, Gissendaner also sought to have three State witnesses, including her former best friend Kogut, beaten and robbed.

Gissendaner and Owen were each indicted for malice murder and felony murder, with the predicate felony being kidnaping resulting in bodily injury.  After filing notice of its intent to seek the death penalty, the prosecution offered Gissendaner and her codefendant identical plea agreements for a life sentence with a contract not to seek parole for 25 years.  Absent any agreement restricting parole eligibility, a straight life sentence would have made them eligible for parole after 14 years.  Owen accepted the prosecution's plea offer and agreed to testify against Gissendaner if her case went to trial.  After consulting with her two court-appointed attorneys — lead counsel Edwin Wilson and co-counsel Steve Reilly — Gissendaner rejected the prosecution's plea offer and made a counteroffer for a straight life sentence with no contract restricting parole eligibility.  The State

4

rejected that counteroffer, but left its initial plea offer open until shortly before trial. After being informed of the State's rejection of her counteroffer, Gissendaner again refused to accept the State's offer of life with no parole for 25 years and insisted on her right to a jury trial. A jury convicted her of malice murder on November 18, 1998.

At the penalty phase of the trial, the jury unanimously voted to impose the death penalty after finding two statutory aggravating circumstances: (1) the murder of Douglas Gissendaner was committed during the course of another capital felony, namely kidnaping with bodily injury; and (2) Gissendaner caused or directed another, namely Owen, to commit the murder. See Ga. Code Ann. § 17-10-30(b)(2), (6) (1998). Gissendaner's conviction and capital sentence were affirmed on direct appeal by the Georgia Supreme Court. Gissendaner, 532 S.E.2d at 682. In upholding her death sentence, the court emphasized "the deliberate, even insistent, manner in which Gissendaner pursued her husband's death, the fact that the murder was the unprovoked and calculated killing of a close family member, the fact that she arranged the murder to obtain money, and the fact that she attempted to avoid responsibility for her conduct by suborning perjury and orchestrating violence against witnesses." Id. at 691.

Gissendaner filed a state habeas petition in December 2001, raising 36 claims for relief and a bevy of subclaims. Following a two-day evidentiary

hearing, on February 16, 2007 the state trial court denied Gissendaner's petition in an order containing findings of fact and conclusions of law.  After the Georgia Supreme Court declined to issue a certificate of probable cause to allow Gissendaner to appeal the denial of her state habeas petition, she filed the 28 U.S.C. § 2254 federal habeas petition in this case on January 9, 2009.  The district court denied that petition on March 21, 2012, and later denied Gissendaner's motion to alter or amend judgment.

The district court did, however, grant Gissendaner a certificate of appealability on four of her claims for relief, three of which she has asserted to us: (1) her trial attorneys were ineffective for failing to "advocate for and negotiate a plea agreement for a sentence less than death"; (2) the State violated its obligations under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963), when it failed to disclose the prosecution team's handwritten notes from the final pretrial interview of her codefendant and accomplice, Owen; and (3) trial counsel rendered ineffective assistance during the penalty phase of her trial by failing to adequately investigate and present mitigating evidence of her alleged history of sexual abuse, physical abuse, and mental health issues.[1]

---

[1] The fourth claim on which the district court granted a certificate of appealability asserted that the prosecutors violated Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763 (1972), by knowingly offering false testimony at her trial.  During the course of this appeal, Gissendaner withdrew her Giglio claim.

6

## I. Standard of Review

We review <u>de novo</u> the denial of a federal habeas petition under 28 U.S.C. § 2254. <u>Jamerson v. Sec'y for Dep't of Corr.</u>, 410 F.3d 682, 687 (11th Cir. 2005). The Antiterrorism and Effective Death Penalty Act of 1996 imposes on federal courts a highly deferential standard for evaluating state court rulings on the merits of a constitutional claim, which precludes the grant of federal habeas relief unless the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); <u>see also</u> <u>Felkner v. Jackson</u>, — U.S. —, 131 S.Ct. 1305, 1307 (2011).

A state court decision is "contrary to" clearly established federal law if it applies a rule that contradicts the governing law set forth by the United States Supreme Court, or arrives at a result that differs from Supreme Court precedent when faced with materially indistinguishable facts. <u>Bell v. Cone</u>, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850 (2002). An "unreasonable application" of clearly established federal law, by contrast, occurs when "the state court correctly identifies the governing legal principle" from the relevant Supreme Court decisions "but unreasonably applies it to the facts of the particular case." <u>Id.</u> A state court's application of Supreme Court precedent or its determination of the facts is

7

"unreasonable only if no 'fairminded jurist' could agree with the state court's determination or conclusion."  Holsey v. Warden, Ga. Diagnostic Prison, 694 F.3d 1230, 1257 (11th Cir. 2012) (quoting Harrington v. Richter, — U.S. —, 131 S.Ct. 770, 786 (2011)).

## II. The Ineffective Assistance Claim Involving Plea Negotiations

Gissendaner contends that her trial attorneys rendered ineffective assistance of counsel in failing to "advocate for and negotiate a plea agreement for a sentence less than death," arguing that counsel provided her with an unrealistic assessment of her chances for an acquittal, unreasonably advised her that a death sentence was unlikely given that she is a woman, failed to inform her that there was no "real difference" between the prosecution's plea offer and her counteroffer for a straight life sentence, and did not urge her to accept the prosecution's offer.  She asserts that, but for these failures, she would have accepted the prosecution's plea offer of a life sentence with a contract not to seek parole for 25 years, as evidenced by her counteroffer to plead guilty in exchange for a straight life sentence.

The United States Supreme Court, well before its recent companion decisions in Missouri v. Frye, — U.S. —, 132 S.Ct. 1399 (2012), and Lafler v. Cooper, — U.S. —, 132 S.Ct. 1376 (2012), recognized that the familiar two-part test articulated in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984), applies to "ineffective-assistance claims arising out of the plea process."  Hill v.

8

Lockhart, 474 U.S. 52, 57, 106 S.Ct. 366, 370 (1985); see also Frye, 132 S.Ct. at 1405 ("Hill established that claims of ineffective assistance of counsel in the plea bargain context are governed by the two-part test set forth in Strickland.").  Under that two-part test, a petitioner asserting a claim of ineffective assistance of counsel must demonstrate both deficient performance and prejudice — that counsel's performance "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 687–88, 694, 104 S.Ct. at 2064, 2068.  Where, as here, a petitioner rejects a plea offer, she must establish that there is a reasonable probability that she would have accepted that offer but for counsel's deficient performance, and that the plea would have resulted in a lesser charge or a lower sentence.  See Frye, 132 S.Ct. at 1409; Coulter v. Herring, 60 F.3d 1499, 1504 (11th Cir. 1995) (applying Hill to a rejected plea offer and concluding that, under those circumstances, prejudice requires a showing that "there is a reasonable probability that, but for counsel's errors, [the petitioner] would have pleaded guilty and would not have insisted on going to trial") (quotation marks, ellipsis, and brackets omitted).

As we have already mentioned, the prosecution offered to agree to a life sentence for Gissendaner if she would contractually bind herself not to seek parole for 25 years.  Trial counsel discussed the plea offer with Gissendaner.  They told

her, among other things, that it was the same offer extended to her codefendant, Owen. Counsel advised Gissendaner that they believed that she had a realistic chance of an acquittal and that, even if convicted at trial, a death sentence was unlikely because she did not physically carry out her husband's murder, was a woman, and was a mother of three young children. At the state habeas hearing, attorney Wilson testified to his belief that jurors "are less likely to sentence a woman to death than a man." Co-counsel Reilly echoed that sentiment, explaining that the unlikelihood that Gissendaner would be sentenced to death "was a fairly common assessment among other colleagues in the local bar." He testified that there was no other woman on death row in Georgia at the time. Despite their views on Gissendaner's chances for acquittal or a life sentence, neither attorney urged Gissendaner to reject or accept the prosecution's plea offer. They left the decision to her.

Gissendaner, as her attorneys testified at the state habeas proceeding, was unwilling to accept anything more than a straight life sentence, meaning one with normal parole eligibility, because she felt that she was less culpable than Owen and for that reason deserved a lesser sentence. At no point did Gissendaner indicate to either counsel, or to anyone insofar as the record shows, that she would accept the State's offer of a life sentence with the contractual restriction ruling out parole for 25 years. In light of Gissendaner's adamant position, her counsel made a

10

counteroffer for a straight life sentence with no contract restricting parole eligibility, which the State rejected.

In rejecting Gissendaner's claim on the merits, the state habeas court concluded that counsel's performance during the plea-bargaining process was neither deficient nor prejudicial. The court found "no evidence that [Gissendaner] did not understand the plea offer and [the] risk of going to trial," including the possibility of a death sentence, and it found that trial counsel's failure to successfully negotiate a plea for a sentence less than death did not constitute deficient performance. The court also found that Gissendaner was not prejudiced by any alleged deficient performance on the part of counsel, emphasizing that she had rejected the prosecution's plea offer "because she believed herself to be less culpable than Owen" and that there was no "evidence that [her] decision to go to trial or take the plea offer would be different with any different recommendation from counsel."

Insofar as Gissendaner's claim is that counsel should have somehow persuaded the prosecutors to offer her a better plea bargain than they did, specifically one that would have made her eligible for parole in the usual time, there is nothing in the record to support any suggestion that counsel could have done more than they did. Counsel did make a counteroffer to that effect but the prosecutors rejected it, and we do not know of anything they could have done that

11

would have persuaded the prosecutors to give Gissendaner a better deal than her cooperating codefendant Owen got. For all that appears, the Great Negotiator Henry Clay himself could not have gotten what Gissendaner wanted. The state court's decision regarding that aspect of the claim clearly is not unreasonable.

As for the aspect of the ineffective assistance claim concerning counsel's advice to Gissendaner about the deal the prosecutors offered her, we need not address the question of deficient performance because the state habeas court's finding that Gissendaner had failed to demonstrate the requisite prejudice did not involve an unreasonable application of Strickland or an unreasonable determination of fact.[2] See 28 U.S.C. § 2254(d); Windom v. Sec'y, Dep't of Corr., 578 F.3d 1227, 1248 (11th Cir. 2009) ("Because the failure to demonstrate either deficient performance or prejudice is dispositive . . ., there is no reason for a court deciding an ineffective assistance claim to address both components of the inquiry if the defendant makes an insufficient showing of one.") (quotation marks and ellipsis omitted). The undisputed evidence (Gissendaner never testified) is that

---

[2] We do not mean to imply that there is any reason to believe that the attorneys' advice to Gissendaner was outside the wide range of reasonable professional assistance. Take, for example, their belief that, because she is a woman, Gissendaner was unlikely to receive the death penalty. It is a fact that while women account for 10% of annual murder arrests, they account for just 2.1% of the 8,375 capital sentences (i.e., 178) imposed in the United States from 1973 through 2012. Victor L. Streib, Death Penalty for Female Offenders, January 1, 1973, through December 31, 2012, at 3 (2013), http://www.deathpenaltyinfo.org/documents/FemDeathDec 2012.pdf (last visited Oct. 18, 2013). Only 6 women, including Gissendaner, have been sentenced to death in Georgia during the 39-year period between 1973 and 2012. Id. at 5, 10–16. Before Gissendaner, the last death sentence imposed on a female offender in Georgia occurred 16 years earlier in 1982, and Georgia has not executed a woman in nearly seventy years, not since March of 1945. Id. at 7, 11.

Gissendaner was unwilling to accept anything more than a straight life sentence no matter what because believing herself to be less culpable than Owen, she refused to accept the same sentence he had received. In light of the evidence, the state court reasonably concluded that there was no reasonable probability that, but for counsel's allegedly deficient advice, Gissendaner would have accepted the prosecution's plea offer of a life sentence with a contract not to seek parole for 25 years.

Gissendaner points to her willingness to plead guilty to a straight life sentence, embodied in her counteroffer, as evidence that she would have accepted the prosecution's offer had she received different advice from counsel. That is a non sequitur. A willingness to accept something more favorable than what is offered does not indicate a willingness to accept what is offered. The prosecution offered a life sentence with a 25-year restriction on parole eligibility and refused to accept Gissendaner's counteroffer of a straight life sentence. The material difference between the offer and the counteroffer, a difference that mattered to both sides, is the difference between no parole eligibility for 25 years instead of for14 years. Because the state court reasonably found that Gissendaner had failed to carry her burden of demonstrating that she was prejudiced by counsel's advice during the plea process, the district court correctly denied federal habeas relief on this ineffective assistance of counsel claim.

13

### III. The Brady Claim

In Brady v. Maryland, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87, 83 S.Ct. at 1196–97. A Brady violation consists of three basic components: "[1] [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 1948 (1999). The prejudice or materiality requirement is satisfied "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 280, 119 S.Ct. at 1949 (quotation marks omitted).

Gissendaner contends that the State violated its Brady obligations by failing to disclose the prosecution team's handwritten notes from the last of several pretrial interviews with Owen, her codefendant and the chief witness against her. Owen was interviewed by police investigators and State prosecutors on five occasions before the start of Gissendaner's trial. During the two earliest interviews, which bookended the discovery of the victim's body, he denied any involvement in the death and disappearance of Douglas Gissendaner. But in his

14

third interview, conducted on February 24, 1997, Owen confessed to the murder and implicated Gissendaner as his accomplice, telling investigators that she had planned the murder, had provided him with directions to the crime scene, and had brought to the scene the accelerant he used to burn her husband's car.  During that interview, Owen also stated that Gissendaner did not arrive at the scene until after he had murdered her husband and had driven around for a while awaiting her page. Owen made similar statements during his plea hearing, held on December 22, 1997, and in his fourth pretrial interview, held on January 7, 1998, though in that interview he asserted that Gissendaner had taken him to the crime scene before the night of her husband's murder.

On October 21, 1998, twelve days before the start of Gissendaner's trial, Owen was interviewed for the last time by a trio of State prosecutors:  Chief Assistant District Attorney Phil Wiley, Assistant District Attorney Nancy Dupree, and Assistant District Attorney George Hutchinson.  After the interview, the prosecutors prepared and disclosed to the defense a typewritten summary of Owen's statements, which purported to reveal the information that Owen had given during that last interview that differed from what he had said in any of the earlier interviews.  The summary reported that Owen, for the first time, claimed that Gissendaner had arrived at the crime scene while her husband's murder was taking place and later walked into the woods to confirm that her husband was dead.  The

15

summary also noted that Owen had again stated that Gissendaner had brought to the murder site the accelerant used to burn the victim's car.

The State did not, however, disclose the handwritten notes taken by each member of the prosecution team during the October 21, 1998 interview, which collectively included several details that were not included in the typewritten summary provided to the defense. ADA Hutchinson's notes indicated that, approximately halfway through the interview, Owen stated that Gissendaner had taken him to the crime scene sometime before the murder and that, on the night of the murder, she arrived at the scene while he was in the woods with her husband. Owen then appeared to give seemingly inconsistent accounts about Gissendaner's actions following her arrival, first stating that she "never came up to where [the] killing was until after [the] victim [was] dead" and then stating that she "never came up to see the body." Several pages later, ADA Hutchinson's notes include the notation, "why not tell defendant there?," which indicated that one of the State prosecutors had asked Owen a question to that effect. Hutchinson's notes show that Owen replied that it "didn't matter if she [was] there" because he "still killed" the victim and he then reiterated that Gissendaner had ventured into the woods to inspect her husband's body.

ADA Dupree's notes contained an additional detail about that last pretrial interview that was not reflected in the notes of her colleagues or the typewritten

16

summary disclosed to the defense. Her notes indicate that Owen said that he had initially supplied Gissendaner with the accelerant that she brought to the murder scene.[3]

Owen's trial testimony combined various features of his earlier statements to the police and State prosecutors, which defense counsel deftly exploited in their attempt to "poke holes" in the prosecution's case by painting Owen as a confessed murderer and an unbelievable witness who had given a number of inconsistent statements throughout the proceedings. At trial Owen testified that Gissendaner furnished him with the murder weapons, selected the crime scene, arrived at the scene while her husband's murder was taking place, went into the woods with a flashlight to confirm that her husband was dead, and then helped Owen set fire to her husband's car with "kerosene that [she] had in her car." Owen did not offer any testimony about who had originally obtained the kerosene and, inconsistently with his final pretrial statement, he testified that Gissendaner had merely given him directions to the murder scene, which he claimed not to have visited beforehand.

On cross-examination, defense counsel grilled Owen about his prior inconsistent statements, eliciting admissions that he: (1) initially lied to investigators about his whereabouts on the night of the murder; (2) repeatedly

---

[3] ADA Wiley's notes confirmed Hutchinson's account of the interview, including Owen's assertion that Gissendaner had arrived at the crime scene while her husband's murder was taking place and later went into the woods with a flashlight to inspect his body. Wiley's notes do not contain any other information relevant to Gissendaner's Brady claim.

17

stated, including while he was under oath at his plea hearing, that Gissendaner did not come out to the crime scene until after he had killed her husband; and (3) again lied to the police when he informed them that he drove around after the murder waiting for Gissendaner's page. Owen candidly conceded to defense counsel that he had "told a lot of lies" during the course of the investigation into Douglas Gissendaner's death.

The state habeas court concluded that the prosecutors' interview notes contained evidence that, while not exculpatory in terms of Gissendaner's guilt or the aggravating sentencing factors found by the jury, was nevertheless favorable to the defense because it could have been used to further impeach Owen's trial testimony. The court found, however, that the undisclosed statements contained in the notes were not material because there was no reasonable likelihood that, when considered collectively, they would have altered the outcome of either the guilt or the penalty phases of the trial. The court explained that defense counsel brought to the jury's attention numerous inconsistencies in Owen's statements, making further impeachment less vital, and that the prosecution had presented a wealth of incriminating evidence other than Owen's trial testimony, including phone records showing that Gissendaner had contacted Owen 65 times in the days leading up to the murder, her confession to Pamela Kogut, and her letter from jail seeking to suborn perjury and intimidate State witnesses. The court rejected Gissendaner's

18

contention that the notation in ADA Hutchinson's notes, "why not tell defendant there?," showed that the State prosecutors had prompted Owen to further inculpate her by stating that she went to view the body of her murdered husband.  In the court's assessment, Gissendaner's interpretation of the notation was "not reasonable" and she had "failed to show a context in which the phrase would influence Owen to change his testimony."

The state habeas court's decision regarding this claim was not inconsistent with clearly established federal law or based on an unreasonable determination of fact.  The court reasonably concluded that there was no Brady violation with respect to the alleged evidence of prosecutorial prompting.  Gissendaner's contention that ADA Hutchinson's notation, "why not tell defendant there?," proves prompting teeters atop the precarious premise that Owen had not stated that Gissendaner had visited the actual murder site until after a prosecutor suggested it with that question.  ADA Hutchinson's interview notes indicate, however, that well before Owen was asked "why not tell defendant there?," Owen had already said that Gissendaner walked up to the murder site "after [the] victim [was] dead."  The most reasonable interpretation of ADA Hutchinson's notes is that after Owen volunteered that Gissendaner was present at the crime scene during her husband's murder, one of the State prosecutors asked him why he had not said that during any of his earlier interviews.  Instead of prompting Owen to state that fact, the

19

prosecutors were challenging his statement of the fact because he had not said it before. At the state post-conviction hearing, all three members of the State's prosecution team testified that they never suggested to Owen that he say Gissendaner had walked into the woods to inspect her husband's body or otherwise exaggerate her culpability. The state habeas court reasonably found that Gissendaner's interpretation of ADA Hutchinson's notation is "not reasonable." As a result, the note was neither favorable to the defense nor material under Brady.

It was also reasonable for the state court to conclude that the remaining information contained in the prosecutors' notes that was omitted from the typewritten summary disclosed to the defense was not material; there was no reasonable likelihood that it would have altered the outcome of either the guilt or sentence stages of the trial. See Strickler, 527 U.S. at 280, 119 S.Ct. at 1949. The questions of whether Gissendaner had taken Owen to the crime scene before the murder, instead of just giving him directions there, and whether Owen had initially supplied Gissendaner with the accelerant that she later brought to the scene, are not relevant to her guilt. Nor are those questions relevant to her sentence, which was based on the aggravating circumstances that the murder occurred during the commission of another felony and was carried out by another at Gissendaner's direction. Not only that, but Owen was vigorously cross-examined at trial about his prior inconsistent statements, including his repeated assertions that Gissendaner

20

did not arrive at the crime scene until after he had murdered her husband, and he frankly conceded that he had "told a lot of lies" during the murder investigation. The state habeas court reasonably found that further impeachment of Owen based on the undisclosed statements contained in the prosecution team's notes would not have created a reasonable probability of a different result in either phase of the trial. The district court correctly denied the Brady claim.

## IV. The Penalty Phase Ineffective Assistance Claim

Gissendaner claims that her trial attorneys failed to conduct an adequate penalty phase investigation into her alleged history of sexual abuse at the hands of six different assailants, into the physical abuse that she endured as a child at the hands of her stepfather, and into the psychological effects of that abuse, including post-traumatic stress disorder and frontal lobe brain damage. She argues that counsel's mitigation investigation was unreasonably "limited" and "curtailed" because they purportedly (1) failed to follow up on her allegations of sexual abuse by obtaining documentary evidence and interviewing witnesses who could provide readily available corroboration, and (2) did not commission a comprehensive mental health evaluation that extended beyond issues of insanity and mental retardation. Gissendaner urges us to conclude that counsel's decision not to present any evidence of abuse at sentencing was deficient because it was not informed by a reasonable investigation.

21

The scope of counsel's investigation, like all other actions undertaken by counsel, need only be objectively reasonable under the circumstances to satisfy constitutional demands.  See Strickland, 466 U.S. at 691, 104 S.Ct. at 2066 ("In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.").  Counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  Id.  As the Supreme Court emphasized in Strickland, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," while "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  Id. at 690–91, 104 S.Ct. at 2066.  In evaluating the reasonableness of counsel's investigation, courts must consider both "the quantum of evidence already known to counsel" and whether that evidence "would lead a reasonable attorney to investigate further."  Wiggins v. Smith, 539 U.S. 510, 527, 123 S.Ct. 2527, 2538 (2003).

But always, "[j]udicial scrutiny of counsel's performance must be highly deferential," indulging the "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance."  Strickland, 466 U.S. at 689, 104 S.Ct. at 2065.  Because Strickland calls for an objective inquiry into the

22

reasonableness of counsel's performance — an inquiry which asks only whether "some reasonable lawyer" could have pursued the challenged course of conduct — a petitioner bears the heavy burden of showing that "no competent counsel would have taken the action that his counsel did take." Chandler v. United States, 218 F.3d 1305, 1315 & n.16 (11th Cir. 2000) (en banc); see also Harrington, 131 S.Ct. at 790 ("Strickland . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.").

Where the highly deferential standards mandated by Strickland and AEDPA both apply, they combine to produce a doubly deferential form of review that asks only "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington, 131 S.Ct. at 788. This "[d]ouble deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." Evans v. Sec'y, Fla. Dep't of Corr., 699 F.3d 1249, 1268 (11th Cir. 2012).

This is not one of those rare cases. Far from it. To explain how far, we will recount the scope of counsel's penalty phase investigation and the evidence submitted during the state habeas proceedings before analyzing the state court's decision under the deferential standards mandated by AEDPA.

23

A.

Although attorneys Wilson and Reilly collaborated on various aspects of Gissendaner's case, Reilly was primarily responsible for interviewing potential mitigation witnesses for the penalty phase of the trial. In fulfilling that responsibility, Reilly spent a significant amount of time with Gissendaner and a number of her relatives, including her mother Maxine Wade. He did so to glean information about her background, family life, and marriage to the victim. Reilly met with Gissendaner on a regular basis and, with her input, compiled a timeline of significant events in her life; made lists of her former employers, residences, schools, and special training; and even constructed a family tree that included 23 relatives, along with their addresses and telephone numbers, who could provide information about Gissendaner. Counsel also obtained Gissendaner's military, mental health, and medical records, and he had the benefit of a detailed 40-page journal that Gissendaner had prepared in custody while awaiting trial.

Gissendaner, either in person or through her journal, informed counsel that she had been raped by her neighbor's father when she was nine years old; had been molested by her stepfather, William "Billy" Wade, when she was ten or eleven; and that her first child, with whom she became pregnant while a senior in high school, was the product of date rape. She also claimed that she was raped by Gregory Owen in May 1996 and had told several people about it, including her

24

cousin Tangee Brookshire, her coworker Laurie Horsley, and her friend Cathy Nesbitt.

Wilson and Reilly spoke to Gissendaner's mother, Maxine Wade, on a number of occasions, questioning her about the allegations of sexual abuse and supplying her with questionnaire titled "Suggested Areas to Explore in Defendant History," which covered topics concerning Gissendaner's childhood, family history, employment history, mental health history, and military history. The answers Wade gave were far from consistent, and she was unable to provide any definitive answers to questions about the alleged incidents of sexual abuse. On the questionnaire counsel gave her, Wade reported that she knew of nothing to indicate that Gissendaner had suffered "sexual or physical abuse by parents, siblings, relatives or others," and she said that no member of her family had a history of mental illness.

During her many conversations with counsel, however, Wade intimated that Gissendaner may have been molested by her stepfather, Billy Wade, when she was around twelve years old. She said that when Gissendaner was that age he occasionally slept in a spare bed in her bedroom, saying that the mattress there was more comfortable than the one in the master bedroom. Although she confirmed that Gissendaner had become pregnant with her first child when she was a senior in high school, Wade in no way suggested that the pregnancy was the result of date

rape. While Wade informed counsel that Billy Wade had physically abused her in front of Gissendaner and her brother, Shane Brookshire, she did not indicate that Billy Wade had ever been physically abusive to either of the two children.

In addition to Gissendaner's mother, Reilly interviewed 19 of the remaining 22 family members Gissendaner had listed on her family tree, seven of whom lived out of state in Alabama, and counsel also interviewed one close family friend. The family members interviewed by counsel included Gissendaner's biological father (Larry Brookshire), brother (Shane Brookshire), stepmother (Edna Brookshire), five uncles (including Delane Conaway), three aunts (including Darlene Bearden), four cousins (including Tangee Brookshire), and four grandparents. Counsel also hired an experienced private investigator, Dennis Miller, who interviewed an additional twelve witnesses for both phases of the trial, including Laurie Horsley, Cathy Nesbitt, and Jodi Stephens, a close personal friend who had served in the military with Gissendaner. Reilly, according to his testimony at the state post-conviction hearing, attempted to contact "[a]s many people as [he] was aware of" and "for whom [he] could get a telephone number and/or address."

None of the many potential penalty phase witnesses Reilly interviewed was able to corroborate Gissendaner's allegations of sexual abuse. Nor was there any documentary evidence, such as medical records, mental health records, or police reports, to corroborate those allegations. Tangee Brookshire and Laurie Horsley

26

did confirm that Gissendaner had told them that Owen either did rape her or had tried to do so, but Brookshire did not believe Gissendaner's allegations. And Horsley also recalled Gissendaner "agonizing over choosing who she wanted to spend her life with, Doug or Greg Owen[]." Cathy Nesbitt, the third person who purportedly knew about the alleged rape, refused to talk about it on the ground that she had "nothing good to say about [Gissendaner]."

Defense counsel went beyond interviewing Gissendaner's relatives, friends, and former coworkers. Although Gissendaner had no significant history of mental illness, counsel retained a mental health expert, Dr. Richard Stark, to conduct a psychological evaluation. Wilson specifically asked Dr. Stark to assess whether there were any potential defenses based on "retardation or insanity" and provided him with a "general context of the situation." While neither Wilson nor Reilly could later recall whether Dr. Stark was asked to evaluate Gissendaner for mitigation purposes, Reilly did testify that he believed that Dr. Stark's psychological assessment "covered issues which potentially might have been utilized for mitigation purposes." Dr. Stark ultimately found no signs of mental retardation or anything else that might establish a "mental defense," though he did postulate that Gissendaner might be gay or bisexual and that her rejection of her sexual orientation was the root cause of her numerous acts of infidelity.

27

In light of Dr. Stark's psychological assessment, counsel decided not to spend any more of their investigative and preparation resources on Gissendaner's mental health. They discussed whether they should present the evidence of sexual abuse they had turned up but decided not to do so given the lack of any concrete corroboration. At the state collateral hearing, Reilly explained that he and Wilson felt that the allegations of sexual abuse were "not substantiated with enough detail to avoid the State turning it against us" by suggesting that Gissendaner was "creating excuses to deflect blame." He elaborated: "[A]nything we were going to put in sentencing had to be substantiated to the point that it was credible in the eyes of the jury, that couldn't be tossed aside as some additional attempt as described that way by the State to deflect blame." Reilly was referring to the prosecution's depiction of Gissendaner at trial as the mastermind behind her husband's murder and a manipulative liar who would "do anything to avoid responsibility for her own actions," including attempting to suborn perjury and intimidate State witnesses. Counsel concluded that her story about having been sexually abused could fit within the State's narrative.

Instead of presenting the unsubstantiated allegations of sexual abuse at sentencing, counsel opted to call eight character witnesses, including Maxine Wade, Shane Brookshire, Darlene Bearden, and Jodi Stephens, to attest to Gissendaner's good character and to plead for mercy. Those witnesses informed

28

the jury that Gissendaner was a kind, compassionate, and loving person, a caring mother to her three young children, and a military veteran who had no significant criminal history before the murder of her husband. They also pleaded with the jury to spare Gissendaner's life, emphasizing that her death would have a devastating impact on her children. The prosecution, as defense counsel rightly suspected, again sought to portray Gissendaner as a liar who masterminded the murder of her husband and consistently attempted "to shield herself from any responsibility."

## B.

During the state habeas proceedings, Gissendaner submitted affidavits from 25 relatives, friends, and former coworkers, as well as reports from three mental health experts retained by collateral counsel, in support of her claim that penalty phase counsel had failed to adequately investigate and present evidence of her alleged history of abuse and mental health issues. The majority of Gissendaner's supporting affidavits, 16 of the 25 submitted, broadly described the drunken and dysfunctional deeds of the extended Conaway clan — Gissendaner's family on her mother's side — but offered little information about her upbringing or the abuse that she allegedly suffered. The remaining nine affidavits, which did describe alleged incidents of physical and sexual abuse, came from (among others) Gissendaner's mother, her aunt Darlene Bearden, her cousin Shelia Muller, and her friends Laurie Horsley and Jodi Stephens. Collectively, those nine affiants

29

indicated that they had heard, either directly from Gissendaner or indirectly through someone else, that Gissendaner had been sexually molested as a child by her stepfather, raped as an adult by Owen, and that her first child was conceived as a result of date rape.

Those nine affidavits also included allegations of physical and sexual abuse that had not been mentioned earlier by either Gissendaner, or her mother, or any of the other multitude of witnesses interviewed by counsel before trial. Maxine Wade asserted that when Gissendaner was only three or four years old, she noticed that her daughter's genital area was "red and raw looking" and that Gissendaner, when asked about it, said that her stepfather's nine-year-old nephew "had done it with his finger." She also recounted that Gissendaner, as an adult, once told her that she had been sexually abused by her uncle Delane Conaway, though only after Wade had informed Gissendaner that her cousin Shelia Muller had apparently been molested as a child by Delane. Muller and her own mother, Darlene Bearden, likewise asserted that Muller had been sexually molested by her uncle Delane in 1968 or 1969, when Muller was six or seven years old and Delane was a senior in high school, and that they were told by Maxine Wade that Gissendaner claimed to have suffered similar abuse. Jodi Stephens stated that Gissendaner told her that her stepfather had abused her sexually and physically.

30

Although trial counsel had interviewed at least five of the nine affiants at the time of trial (Wade, Bearden, Brookshire, Horsley, and Stephens), three of whom had also testified at sentencing (Wade, Bearden, and Stephens), none of those witnesses could adequately explain why they did not tell counsel what they knew or had heard about the alleged abuse. For example, despite abundant evidence to the contrary, Wade insisted that trial counsel never questioned her about any sexual abuse that Gissendaner may have suffered. Bearden, while acknowledging that she met with trial counsel on several occasions, simply asserted that they did not discuss Gissendaner's allegations of sexual abuse; she did not explain why she did not tell counsel about all relevant information that she had.

In further support of her ineffective assistance claim, Gissendaner submitted reports from three mental health professionals retained by collateral counsel: Dr. Mindy Rosenberg, a psychologist specializing in childhood trauma; neuropsychologist Dr. Myla Young; and psychiatrist Dr. William Bernet. Dr. Rosenberg prepared a social history based on interviews with Gissendaner, several of her relatives, and the affidavits compiled by collateral counsel. According to that social history, Gissendaner had been physically abused as a child by her stepfather, mother, and biological father, as well as sexually abused throughout her childhood and adult life by six different assailants — her stepfather's nephew, her stepfather, her "neighbor friend's stepfather," her uncle Delane, the father of her

31

first child, and Owen.  Dr. Rosenberg concluded that Gissendaner had been the "victim of severe and prolonged sexual and physical abuse," which exerted "a profound impact on her psychological functioning" and led to "significant impairment in her interpersonal relationships."

Dr. Young evaluated Gissendaner over the course of two days in March 2004 and administered a battery of neuropsychological tests to assess her intellectual and emotional functioning, which included a Rorschach inkblot test and a Rey Complex Figure test.  Based on her testing and unquestioning reliance on Dr. Rosenberg's social history, Dr. Young concluded that Gissendaner had experienced "overwhelming emotional stress and psychological distress" and suffered from frontal lobe brain damage "severe enough that it would compromise [her] daily functioning," and both of those maladies made it "highly unlikely that [Gissendaner had] the cognitive ability to be the sole master-mind, initiator, planner, and provider of means for murder with the intent of financial gain, as she was portrayed at trial."

Dr. Young's diagnosis of brain damage was premised on the astonishing results of the Rey Complex Figure test, which apparently placed Gissendaner's ability to organize complex information "in the less than 1st percentile."  Dr. Young believed that result despite the fact that Gissendaner had been consistently employed since the age of 16, had successfully graduated from high school, and

32

had served in the military for 18 months.  Dr. Young conceded that she had relied on the social history that Dr. Rosenberg had composed without making any attempt to verify its contents, that the Rorschach test she depended on had been criticized as unreliable and unscientific by the psychiatric community, and that her neuropsychological tests did not incorporate any specific subtests to determine whether Gissendaner was malingering during the course of her evaluation.  With a naiveté that would perplex Pollyanna, Dr. Young insisted that in the 25 capital cases in which she had testified for the defense, no defendant had ever malingered, not even once.

Dr. Bernet met with Gissendaner on a single occasion for a total of four-and-a-half hours and reviewed her medical records, the affidavits collected by collateral counsel, and the reports authored by Drs. Young and Rosenberg.  Based largely on Gissendaner's self-reporting, the social history composed by Dr. Rosenberg, and Dr. Young's neuropsychological findings, Dr. Bernet diagnosed Gissendaner with PTSD, cognitive disorder, chronic depression, and submissive personality traits. He attributed the cause of those diagnosed conditions to Gissendaner's "long history of physical and sexual abuse," and concluded that her mental disorders would have impaired her "ability to premeditate, deliberate, and carry out the plan that she is alleged to have masterminded."

33

Like Dr. Young, Dr. Bernet admitted that he took Dr. Rosenberg's social history at "face value" in drawing his conclusions, without attempting to verify its contents, and that he did not administer any tests designed to assess whether Gissendaner was malingering. Nor did he attempt to contact Dr. Stark, the psychiatrist who evaluated Gissendaner at the time of trial, or Dr. Garlick, the psychiatrist who held regular psychotherapy sessions with Gissendaner throughout 2001 and had found that she did not suffer from PTSD. When confronted with evidence tending to show that Gissendaner had, in actuality, thoughtfully plotted the murder of her husband, Dr. Bernet retreated somewhat from his position that she lacked the capacity to plan the murder, explaining that "having a bad plan is consistent with a person whose abilities are impaired to some extent."

Gissendaner's evidence, with all of its inherent flaws, did not go unchallenged by the State. In an effort to rebut Gissendaner's reports of abuse, the social history that Dr. Rosenberg had composed, and the expert opinions premised on that history, the State submitted affidavits from other members of Gissendaner's family, including her brother Shane and her uncle Delane. Shane Brookshire adamantly disputed the allegations that Gissendaner had been physically abused by her stepfather, mother, and biological father. And both Brookshire and Delane denied that Delane had sexually molested Gissendaner or any of his nieces. Delane also submitted documents showing that, contrary to what Bearden and

Muller had stated in their affidavits, he was not a senior in high school when he allegedly molested Muller in 1968 or 1969, but was only 14 years old at the time; he did not graduate from high school until 1973.

Brookshire and Delane also cast considerable doubt on some of the statements in Maxine Wade's affidavit. Brookshire asserted that, in conversations with his mother, she said she had not told collateral counsel, as they had put in her affidavit, that Delane had molested Gissendaner. And she told Brookshire that "she did not believe that Delane had molested Kelly." Delane similarly stated that, when he confronted Wade about the allegations against him, Wade assured him that she did not believe that he had molested Gissendaner and promised she would have collateral counsel correct her affidavit. When Delane contacted Wade later, however, she told him that she was not going to revise her affidavit because "she believed what she was told" and could not "let them put Kelly to death." During the state habeas hearing, Owen flatly denied ever having raped Gissendaner.

## C.

The state habeas court concluded that trial counsel's penalty phase investigation was not constitutionally deficient and that counsel had "made a reasonable strategic decision not to present" the uncorroborated evidence of sexual abuse that their investigation had uncovered. In reaching that conclusion, the court first recounted the scope of counsel's investigation into Gissendaner's background

35

and family life, which included:  (1) reviewing her detailed journal; (2) obtaining her military, mental health, and medical records; (3) personally interviewing 20 family members plus one close family friend; (4) hiring an experienced private investigator, who interviewed an additional 12 witnesses for both phases of the trial; and (5) retaining a mental health expert, Dr. Stark, to evaluate Gissendaner. The court then found that while counsel were "aware of some of the allegations of physical and sexual abuse as detailed in [Gissendaner's] journal and reported by her mother," they reasonably elected not to present such evidence given the lack of independent evidence to corroborate those allegations and their legitimate concern that, without such corroboration, the prosecution would use the allegations of abuse to bolster its portrayal of Gissendaner as a liar attempting to avoid responsibility for her crime.

The court likewise found that counsel's investigation into possible mental health issues was not deficient, emphasizing that Gissendaner had no history of psychiatric treatment and that Dr. Stark's expert evaluation, which "covered issues which might potentially have been utilized for mitigation purposes," did not yield any information favorable to the defense.  The court noted that the allegations of abuse set forth in Gissendaner's post-conviction affidavits and expert reports were "largely uncorroborated," that the evidence of abuse presented during the state habeas proceedings was "at best in conflict," and that the background information

36

relied upon by Gissendaner's mental health experts was unreliable, making their conclusions unreliable.

In an effort to overcome the deference mandated by AEDPA, Gissendaner contends that the state court unreasonably applied clearly established federal law by conducting "no analysis of the adequacy of trial counsel's investigation" and simply "presuppos[ing] the reasonableness" of that investigation when it concluded that counsel had made a reasonable strategic decision not to present evidence of abuse at sentencing. She also asserts that counsel's mitigation investigation was constitutionally inadequate and, for that reason, counsel cannot be deemed to have made a reasonable and informed penalty phase decision. We disagree on both counts.

While it is undoubtedly true that "a reviewing court must consider the reasonableness of the investigation said to support" a penalty phase decision made by counsel, see Wiggins, 539 U.S. at 527, 123 S.Ct. at 2538, it is not true that the state court in this case simply presupposed the reasonableness of counsel's investigation in concluding that counsel made a strategic decision not to present the allegations of abuse that their investigation had unearthed. The court specifically found that counsel's investigation was adequate, and it did so after recounting all of the measures counsel undertook to uncover information about Gissendaner's upbringing, family life, and relationship with the victim. In any

37

event, AEDPA "focuses on the result" of a state court's decision, "not on the reasoning that led to that result," and nothing in the statute requires a state court to accompany its decision with any explanation, let alone an adequate one. Wright v. Sec'y for Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002); see also Harrington, 131 S.Ct. at 784 ("[D]etermining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.") As we have explained, "[t]elling state courts when and how to write opinions to accompany their decisions . . . smacks of a 'grading papers' approach that is outmoded in the post-AEDPA era." Wright, 278 F.3d at 1255.

The state habeas court's finding that counsel conducted an adequate investigation into Gissendaner's background, including possible incidents of abuse, was entirely reasonable under the facts of this case. Far from being unjustifiably limited or curtailed, as Gissendaner contends, trial counsel's penalty phase investigation was thorough. Either directly or through their private investigator, counsel contacted at least two dozen relatives, friends, and former coworkers in preparation for the penalty phase of the trial, including 20 of the 23 family members that Gissendaner had listed on her family tree. Counsel regularly met with Gissendaner and her mother, supplied her mother with a detailed questionnaire covering Gissendaner's background, gathered information from her

extensive journal, and obtained her medical, mental health, and military records. After their extensive investigation, the only evidence of abuse, sexual or otherwise, that counsel had was:  (1) Gissendaner's self-reports that she had been sexually abused by her stepfather, her neighbor's father, the father of her first child, and Owen; and (2) Maxine Wade's vague suggestion that Gissendaner may have been sexually molested by her stepfather.

Counsel's thorough investigation did not uncover any first-hand witnesses (other than Gissendaner) to the alleged incidents of sexual abuse or any documentary evidence corroborating that abuse, such as police reports, medical records, social service reports, or court records.  Although Gissendaner and her mother asserted during the state habeas proceedings that Gissendaner had been physically abused by her stepfather and sexually abused by her stepfather's nine-year-old nephew and by her uncle Delane, they never informed trial counsel about that despite having many opportunities to do so.  See Strickland, 466 U.S. at 691, 104 S.Ct. at 2066 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. . . . In particular, what investigation decisions are reasonable depends critically on such information."); Williams v. Head, 185 F.3d 1223, 1237 (11th Cir. 1999) ("An attorney does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him.").  It was

39

reasonable for the state habeas court to conclude that counsel's decision to stop their investigation into Gissendaner's allegations of sexual abuse when they did was not objectively unreasonable under the circumstances. "[T]here comes a point," the Supreme Court has said, "at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive of more important duties." Bobby v. Van Hook, 558 U.S. 4, 11, 130 S.Ct. 13, 19 (2009). Or as we have similarly observed, because "lawyers do not enjoy the benefit of endless time, energy or financial resources," an effective attorney "is not required to pursue every path until it bears fruit or until all hope withers." Head, 185 F.3d at 1237 (quotation marks omitted).

This is not a case in which trial counsel "did not even take the first step of interviewing witnesses or requesting records," see Porter v. McCollum, 558 U.S. 30, 39, 130 S.Ct. 447, 453 (2009), conducted a cursory investigation "limited to one day or less" of interviewing witnesses, see Sears v. Upton, — U.S. —, 130 S.Ct. 3259, 3264 (2010) (quotation marks omitted), did not expand their investigation beyond the acquisition of a narrow set of records, see Wiggins, 539 U.S. at 524–25, 123 S.Ct. at 2536–37, or failed to examine readily available documents that they knew the prosecution intended to use in aggravation, see Rompilla v. Beard, 545 U.S. 374, 383–84, 125 S.Ct. 2456, 2464 (2005). Instead, it's a case like Strickland itself in which counsel's "decision not to seek more

40

[mitigating] evidence than was already in hand" fell within "the range of professionally reasonable judgments."  466 U.S. at 699, 104 S.Ct. at 2070.  At the least, fair-minded jurists could so conclude, which is enough to satisfy AEDPA's highly deferential standards and preclude federal habeas relief.[4]  See Holsey, 694 F.3d at 1257.

The state habeas court's finding of no deficient performance was also reasonable with respect to trial counsel's mental health investigation, which included obtaining Gissendaner's mental health records and consulting with Dr. Stark.  Gissendaner asserts that counsel merely asked Dr. Stark to assess whether there was a viable defense based on mental retardation or insanity.  The state habeas court, however, found that Dr. Stark's evaluation "covered issues which might potentially have been utilized for mitigation purposes" — a factual finding that is not objectively unreasonable in light of the record.  See Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S.Ct. 1029, 1041 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the

---

[4] In his post-conviction affidavit, produced over five years after the penalty phase of Gissendaner's trial, Reilly attempted to concede deficient performance, explaining that he "should have more thoroughly investigated" the allegations of sexual abuse and that he "had no tactical nor strategy reason for failing to pursue further investigation" of such abuse. Nevertheless, because Strickland's standard for deficient performance is an objective one, trial counsel's hindsight assessment of the adequacy of his penalty phase investigation is entitled to little, if any, weight. See Windom, 578 F.3d at 1246 n.11 ("Because the adequacy of an attorney's performance is measured against an objective standard of reasonableness, the fact that trial counsel admits that his performance was lacking is of little, if any, consequence."); Jennings v. McDonough, 490 F.3d 1230, 1247 (11th Cir. 2007) ("The Strickland standard of objective reasonableness does not depend on the subjective intentions of the attorney, judgments made in hindsight, or an attorney's admission of deficient performance.").

contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)."). Although neither of Gissendaner's trial attorneys could recall during the state collateral proceedings whether Dr. Stark was specifically asked to examine mental health issues beyond that of mental retardation and insanity, Reilly did testify that he believed that Dr. Stark's assessment "covered issues which potentially might have been utilized for mitigation purposes." The record also indicates that Dr. Stark, after evaluating Gissendaner, surmised that her history of infidelity may have stemmed from a rejection of her bisexuality or homosexuality. That finding indicates that Dr. Stark's assessment extended beyond issues of insanity and mental retardation.

While the record is admittedly ambiguous as to the scope of Dr. Stark's psychiatric evaluation, Gissendaner, who has the burden of proof and persuasion, cannot benefit from those ambiguities or from trial counsel's lack of recollection years after the fact. See Reaves v. Sec'y, Fla. Dep't of Corr., 717 F.3d 886, 901 n.9 (11th Cir. 2013) ("[C]ounsel's understandable lack of memory" when testifying years later about his actions at and before trial should not be equated with deficient performance); Harvey v. Warden, Union Corr. Inst., 629 F.3d 1228, 1245 (11th Cir. 2011) (explaining that, given the presumption that counsel acted

42

reasonably, a petitioner cannot benefit from "trial counsel's short memory"); Williams v. Allen, 598 F.3d 778, 794 (11th Cir. 2010) ("An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption of counsel's competency. Therefore, where the record is incomplete or unclear about counsel's actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.") (quotation marks and brackets omitted); Putman v. Head, 268 F.3d 1223, 1243 (11th Cir. 2001) ("If the record is incomplete or unclear about counsel's actions, then it is presumed that counsel exercised reasonable professional judgment.").

Gissendaner relies on our decision in Ferrell v. Hall, 640 F.3d 1199 (11th Cir. 2011), to support her contention that Dr. Stark's mental health evaluation was "unjustifiably and unreasonably circumscribed." In Ferrell the Georgia Supreme Court had decided that trial counsel's mental health investigation was not deficient even though it consisted of nothing more than hiring a mental health expert to examine the petitioner for mental retardation and "any problems that may have affected his waiver of rights for the statements he gave to the police." 640 F.3d at 1227. In concluding that the state court's decision was unreasonable, we pointed out "the many red flags that had been raised about Ferrell's mental health throughout the proceeding," which should have "led counsel to pursue a more comprehensive mental health investigation." Id. We emphasized that the record

43

revealed "numerous, obvious indicators" that the petitioner suffered from substantial mental health problems, including that he "talked about his religious beliefs excessively," "spoke directly to God," behaved strangely throughout the trial proceedings, and — most importantly — suffered a seizure during the trial itself, which caused him "to fall onto the floor, shake and speak gibberish." Id. at 1227–28. We noted that, "despite Ferrell's obvious mental disabilities," defense counsel never questioned any of his family members about his mental health history, which included hallucinatory episodes and multiple head injuries. Id. at 1228.

The circumstances of this case do not resemble those in Ferrell. There is no indication that Gissendaner exhibited any "red flags" or "obvious indicators" of substantial mental health problems, which would have led a reasonable attorney to delve further into possible mental health issues. Unlike Ferrell, Gissendaner did not talk about religion excessively, speak directly to God, hallucinate, suffer a seizure, shake and speak gibberish, or otherwise behave strangely. Her medical and mental health records revealed no significant mental health issues and, on the questionnaire supplied by counsel, Gissendaner's mother unequivocally stated that there was no history of mental illness in her family.[5] Counsel also knew that

---

[5] The only evidence that counsel had at their disposal to indicate any possible mental health issues was a set of progress notes from Gissendaner's voluntary visit to a mental health center in 1995 to seek treatment for stress and trouble managing her temper with her children.

44

Gissendaner had successfully graduated from high school, held down a series of jobs since she was 16 years old, and served in the military for 18 months. Given Dr. Stark's conclusions and the absence of any other evidence to suggest that Gissendaner suffered from serious mental health issues, it was not unreasonable for the state habeas court to decide that counsel's investigation of Gissendaner's mental health was reasonable. See Callahan v. Campbell, 427 F.3d 897, 934 (11th Cir. 2005) (noting that, when a defendant "does not display strong evidence of mental problems," counsel is not even "required to seek an independent evaluation") (quotation marks omitted).

That Gissendaner, years after the fact, was able to locate and hire three mental health experts willing to testify that she suffers from frontal lobe brain damage, PTSD, and submissive personality traits does not demonstrate that trial counsel's mental health investigation was unreasonably curtailed or otherwise deficient. See Reed v. Sec'y, Fla. Dep't of Corr., 593 F.3d 1217, 1242 (11th Cir. 2010) ("[T]he mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial.") (quotation marks omitted); Davis v. Singletary, 119 F.3d 1471, 1475 (11th Cir. 1997) (same);

Although the notes indicate that Gissendaner reported that she had "serious suicidal thoughts" three months earlier, she also reported no personal or family psychiatric history. A mental status examination at that time concluded that, aside from moderate personal distress, Gissendaner displayed an appropriate affect, normal intellectual functions and thought content, no memory impairment, and good insight.

Horsley v. State of Ala., 45 F.3d 1486, 1495 (11th Cir. 1995) (same).  That is especially true because, as the state habeas court noted, the conclusions of Gissendaner's mental health experts are unreliable and lack even a modicum of credibility.  And we agree with the district court's assessment that the social history report that Dr. Rosenberg composed, which Gissendaner's other expert witnesses blindly accepted in formulating their diagnoses of brain damage and PTSD, was "biased towards uncritical acceptance of [Gissendaner's] self-reports of traumatic childhood experiences" and failed to acknowledge conflicting reports from family members, most notably Shane Brookshire's contentions that his sister had not been subjected to either physical or sexual abuse.

Dr. Young's and Dr. Bernet's conclusions were also unpersuasive for other reasons.  Dr. Young's findings, including her diagnosis of brain damage, were based on Gissendaner's responses to the Rorschach inkblot test, which Dr. Young admitted had been highly criticized in the psychiatric community, and the patently absurd results of the Rey Complex Figure test, which placed Gissendaner — a woman who had successfully completed high school, served in the military, cared for three children, and been consistently employed since the age of 16 — "in the less than 1st percentile" of all people in her ability to organize complex information.  Dr. Young did not attempt to confirm her finding of brain damage through the use of any objective diagnostic tests, such as an MRI or CAT scan, and

46

she employed no specific tests to assess whether Gissendaner was malingering during her evaluation. Her insistence that not one of the two dozen capital defendants she had evaluated over the years had ever attempted to feign mental illness, even though doing so might save them from execution, is incredible enough to render her testimony non-credible.

Dr. Bernet's diagnosis of PTSD, as well as his conclusion that Gissendaner lacked the capacity to premeditate and carry out the murder of her husband, were undermined by his failure to administer any malingering tests, seriously consider evidence showing that Gissendaner had planned the murder, and confer with Gissendaner's previous psychiatrists, one of whom (Dr. Garlick) had held regular psychotherapy sessions with Gissendaner and specifically ruled out a diagnosis of PTSD.

Because the state habeas court's finding that trial counsel conducted a constitutionally adequate mitigation investigation did not involve an unreasonable application of Strickland or depend on an unreasonable finding of fact, the district court correctly rejected Gissendaner's penalty phase claim of ineffective assistance of counsel.[6]

---

[6] The state court also concluded that Gissendaner was not prejudiced by trial counsel's allegedly deficient investigation because there was no "reasonable probability, that but for this performance, the result of [her] trial would have been different." Because Gissendaner has not satisfied her burden of demonstrating deficient performance, however, we need not address the state court's alternative conclusion that there was no prejudice. See Windom, 578 F.3d at 1248.

47

## V. CONCLUSION

For these reasons, we affirm the district court's denial of Gissendaner's

§ 2254 petition for a writ of habeas corpus.

**AFFIRMED.**